**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| MICHAEL ANTONETTI | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: _____ |
| | ) | |
| v. | ) | |
| | ) | |
| ACTIVISION BLIZZARD, INC.; INFINITY | ) | **JURY TRIAL DEMANDED** |
| WARD, INC.; TREYARCH CORPORATION; | ) | |
| TAKE-TWO INTERACTIVE SOFTWARE, INC.; | ) | |
| ROCKSTAR GAMES, INC.; ROCKSTAR | ) | |
| GAMES UK LIMITED f/k/a ROCKSTAR NORTH | ) | |
| LIMITED and DMA DESIGN LIMITED; | ) | |
| BLIZZARD ENTERTAINMENT, INC.; EPIC | ) | |
| GAMES, INC.; EPIC GAMES INTERNATIONAL | ) | |
| HOLDINGS, LLC; UBISOFT | ) | |
| ENTERTAINMENT SA; UBISOFT | ) | |
| DIVERTISSEMENTS INC., d/b/a UBISOFT | ) | |
| MONTREAL; MOJANG STUDIOS; | ) | |
| MICROSOFT CORPORATION; | ) | |
| NINTENDO OF AMERICA, INC.; and | ) | |
| JOHN DOE, an unknown individual, | ) | |
| entity, or corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Michael Antonetti hereby files a *Complaint* against the Defendants— Activision

Blizzard, Inc., Infinity Ward, Inc.; Treyarch Corporation; Take-Two Interactive Software, Inc.,

Rockstar Games, Inc., Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA

Design Limited, Blizzard Entertainment, Inc.; Epic Games, Inc.; Epic Games International

Holdings, LLC; Ubisoft Entertainment SA; Ubisoft Divertissements Inc., d/b/a Ubisoft Montreal,

Mojang Studios; Microsoft Corporation, Nintendo of America, Inc.—notifying each Defendant of

Plaintiff's claims for relief as available under Georgia law. In support thereof, Plaintiff alleges and

states:

## I.   NATURE OF THE ACTION

1.      Video game addiction, also called internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school, and work.

2.      Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering stop interacting with friends and/or family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.       Video game addiction causes rifts between minors and young adults with gaming-addiction and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.      Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.      Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.      The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, minor game players) addicted to the Defendants' video game products in order to maximize Defendants' profits.

7.      Defendants manufactured, published, marketed, and sold video games and gaming

products, including those played by Plaintiff, which Defendants had specifically developed and designed to cause the addiction experienced by Plaintiff and other users.

8.      Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.      Defendants rely on microtransactions to increase their profits from individual games.

10.     Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors and young adults.

11.     Defendants make their games addictive, in part, by encouraging long-term, extended game play despite knowledge that such extended play causes physical harm to the human brain – and particularly to a minor's developing brain.

12.     Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game products is their own bottom line.

13.     By making their games addictive, Defendants can maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game products or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

14.     "Microtransactions" often occur because of Defendants' use of "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times they are subjected to Defendants' deceptive

and harmful conduct and more likely to spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

15.     By keeping minors and young adults playing longer—and spending more money in the game in the process—Defendants are causing physical and mental harm to users while consistently increasing their revenue.

16.     By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these young users age.

17.     Defendants are exploiting consumers, particularly minors and young adults, with unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

18.     Video game addiction impacts thousands of youths and their families across the country, including in Georgia.

19.     Plaintiff is one of those individuals who have been negatively impacted by the addiction and harm caused by each of Defendants' products.

20.     Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused Plaintiff brain damage and gaming addiction, along with Plaintiff's other damages as described herein.

21.     As a result of that gaming addiction and harm caused by Defendants' products, Plaintiff specifically suffers from: brain damage, trouble focusing and being off task during school hours, acting disrespectfully, lying to parents and/or teachers, gamers rage, dropping grades, severe emotional distress, diminished social interactions, loss of friends, and withdrawal symptoms such as rage, anger, and physical outbursts, of which a  severity level that required outpatient counseling and private tutoring.

22.     Plaintiff will require outpatient counseling for video game addiction.

23.     Plaintiff plays the following games approximately 12 hours per day: Fortnite on Nintendo Switch and Call of Duty Black Ops I, Call of Duty Black Ops II, Call of Duty Black Ops III, Call of Duty Black Ops IV, Call of Duty War Zone, Call of Duty Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, and Minecraft on his Xbox One and Xbox X/S.

24.     Plaintiff has also been diagnosed with worsening Attention Deficit Hyperactivity Disorder ("ADHD") and Anxiety due to video game addiction.

25.     As a result of the gaming addiction and harm proximately caused by Defendants' misconduct, Plaintiff requires treatment, including out-patient counseling and medication therapy.

26.     Plaintiff has been injured and harmed as a proximate result of Defendants' actions and misconduct, and they are entitled to compensation and other damages from Defendants under Georgia law.

27.     Defendants, individually and collectively, have willfully and knowingly engaged in fraudulent, deceptive, unfair, immoral, outrageous, wanton, and reckless behavior that damaged and continues to harm not only Plaintiff, but countless other Georgians and citizens of the world. For this conduct, they should be punished, and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

## II.    PARTIES

28.     Plaintiff is and at all times relevant to this action,  a citizen and resident of the State of Georgia whose principal place of residence being in Gwinnett County, Georgia.

29.     Plaintiff is 19 years old at the time of filing of this lawsuit.

30.     Plaintiff began playing video games at 11 years old.

31.    Plaintiff has continued to play video games at an increasing and uncontrollable pace since that time.

32.    Defendant Activision Blizzard, Inc. ("Activision") is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard Building B, Santa Monica, CA 90404.

33.    At all times material hereto, Activision developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Call of Duty (sometimes, "COD") video game series, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

34.    On October 13, 2023, Activision was purchased by Defendant Microsoft Corporation ("Microsoft") for $68.7 billion.

35.    Defendant Infinity Ward, Inc. ("Infinity Ward") is a Delaware corporation with its principal place of business at 21255 Burbank Blvd, Ste 600, Woodland Hills, CA 91367.

36.    At all times material hereto, Infinity Ward developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Call of Duty video game series, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

37.    Defendant Treyarch Corporation ("Treyarch") is a Delaware corporation with its principal place of business at 3420 Ocean Park Blvd., Santa Monica, CA 90405.

38.    Treyarch is a wholly owned subsidiary of Defendant Activision and the only products it develops and produces are the Call of Duty video game series.

39.    At all times material hereto, Treyarch developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

the Call of Duty video game series either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

40.     Defendants Activision, Infinity Ward, and Treyarch acted in concert in developing, creating, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the Call of Duty video game series with all the addictive features and technologies contained therein.

41.     Defendant Take-Two Interactive Software, Inc. ("Take-Two") is a Delaware corporation with its principal place of business at 622 Broadway, New York, NY 10012.

42.     At all times material hereto, Take-Two developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Grand Theft Auto video games, either directly or indirectly, to members of the general public within the State of Georgia including to Plaintiff.

43.     Defendant Rockstar Games, Inc. ("Rockstar Games") is a Delaware corporation with its principal place of business at 80 State Street, Albany, NY 12207.

44.     Rockstar Games is a video game publisher and wholly owned subsidiary of Defendant Take-Two.

45.     At all times material hereto, Rockstar Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Grand Theft Auto video games, either directly or indirectly, to members of the general public within the State of Georgia including to Plaintiff.

46.     Defendant Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA Design Limited ("Rockstar North") is a British company with its principal place of business in Edinburgh, Scotland.

47.     Rockstar North is a video game development studio, owned and operated as a subsidiary by Defendant Rockstar Games, and the primary product it develops are the Grand Theft Auto video games.

48.     At all times material hereto, Rockstar North developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Grand Theft Auto video games, either directly or indirectly, to members of the general public within the State of Georgia including to Plaintiff.

49.     As parent company of Rockstar North and Rockstar Games, Defendant Take-Two is responsible for any damages that may be assessed against Rockstar North and/or Rockstar Games in connection with the Grand Theft Auto video game products.

50.     Defendants Take-Two, Rockstar Games, and Rockstar North (collectively, the "GTA Defendants") acted in concert in developing, creating, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling Grand Theft Auto video games with all the addictive features and technologies contained therein.

51.     Defendant Blizzard Entertainment, Inc. ("Blizzard") is a Delaware corporation with its principal place of business at 1 Blizzard Way, Irvine, CA 92618.

52.     At all times material hereto, Blizzard developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Overwatch video game series either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

53.     As parent company of Blizzard, Defendant Activision is responsible for any damages that may be assessed against Blizzard.

54.     At all times material hereto, Activision developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Overwatch video game series either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

55.     Defendants Blizzard and Activision (collectively, the "Overwatch Defendants") acted in concert in developing, creating, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the Overwatch video game series with all the addictive features and technologies contained therein.

56.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

57.     Epic Games is a video game and software developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video games and platform, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

58.     Defendant Epic Games International Holdings, LLC ("Epic Games Int'l") is a Delaware corporation and may be served with process upon it's registered agent, The Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

59.     Epic Games Int'l is a video game and software developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video games and platform, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

60.     Defendants Epic Games and Epic Games Int'l (collectively, the "Fortnite Defendants") acted in concert in developing, creating, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the Fortnite video games and platform with all the addictive features and technologies contained therein.

61.     Defendant Ubisoft Entertainment SA ("Ubisoft") is a French company with its principal place in Pasteur, France.

62.     At all times material hereto, Ubisoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Rainbow Six video game series either directly or indirectly, to members of the general public within the State of Georgian, including to Plaintiff.

63.     Defendant Ubisoft Divertissements Inc., d/b/a Ubisoft Montreal ("Ubisoft Montreal") is a Canadian corporation with its principal place in Montreal, Quebec, Canada.

64.     At all times material hereto, Ubisoft Montreal developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Rainbow Six video game series either directly or indirectly, to members of the general public within the State of Georgia including to Plaintiff.

65.     Defendants Ubisoft and Ubisoft Montreal (collectively, the "Rainbow Six Defendants") acted in concert in developing, creating, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the Rainbow Six video game series with all the addictive features and technologies contained therein.

66.     Defendant Mojang Studios is Swedish Company with its principal place of business in Stockholm, Sweden.

67.     At all times material hereto, Mojang Studios designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

68.     Mojang Studios is a wholly owned subsidiary of Defendant Microsoft, which acquired Mojang Studios and the Minecraft intellectual property for $2.5 billion in September 2014, and Microsoft is responsible for any damages that may be assessed based on Mojang Studios' wrongdoing in connection with its Minecraft video game product.

69.     Defendants Microsoft and Mojang Studios (collectively, "the Minecraft Defendants") acted in concert in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the Minecraft video game series with addictive features and technologies contained therein

70.     Defendant Microsoft is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052.

71.     Microsoft is authorized to do and does business in the State of Georgia. Microsoft's registered agent for service of process is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

72.     At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied,

and/or sold the Xbox video game consoles, including Xbox One and Xbox X/S, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

73.     At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the Xbox Network (formerly known as Xbox Live) and Xbox Cloud Gaming, which are available product features designed for use with the Xbox gaming console system, including to members of the general public within the State of Georgia, including to Plaintiff.

74.     Microsoft acted in concert with Activision, Infinity Ward, Treyarch, Take-Two, Rockstar Games, Rockstar North, Blizzard, Epic Games, Epic Games Int'l, Ubisoft, Ubisoft Montreal, and Mojang Studios to distribute, market, supply, and/or sell the Call of Duty, GTA 5, Overwatch 2, Fortnite, Rainbow Six, and Minecraft video games and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

75.     Microsoft is the sole owner of Defendant Activision. Though its acquisition has no impact on Activision's liability for the harm it caused Plaintiff, Microsoft is responsible for any damages that may be assessed against Activision.

76.     Prior to its acquisition of Activision, Microsoft acted in concert with Defendants Activision, Infinity Ward, and Treyarch by developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the Call of Duty video game series with all the addictive features and technologies contained therein.

77.     Since Microsoft's acquisition of Activision and the video game studios operating as subsidiaries of Activision, Defendants Activision, Infinity Ward, Treyarch, and Microsoft

(collectively, the "COD Defendants") have acted in concert by developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Call of Duty series with all the addictive features and technologies contained therein.

78.     Microsoft is the sole owner of Defendant Mojang Studios. Accordingly, Microsoft is responsible for any damages that may be assessed based on Mojang Studios' wrongdoing in connection with its Minecraft video game series product.

79.     Defendants Microsoft and Mojang Studios (collectively, the "Minecraft Defendants") acted in concert in developing, creating, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the Minecraft video game series with all the addictive features and technologies contained therein.

80.     Defendant Nintendo of America, Inc. ("Nintendo") is a Washington corporation with its principal place of business located at 4600 150th Avenue NE, Redmond, WA 98052-5113.

81.     Nintendo is authorized to do and does business in the State of Georgia, and its registered agent for service of process is CT Corporation System, 289 S Culver Street, Lawrenceville, Georgia, 30046.

82.     Nintendo is a wholly owned subsidiary of Nintendo Co. Ltd., a Japanese company with its principal place of business in Kyoto, Japan.

83.     At all times material hereto, Nintendo designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Nintendo Switch console and the Nintendo eShop, either directly or indirectly, to members of the general public within the State of Georgia, including Plaintiff.

84.     Nintendo acted in concert with the Fortnite Defendants to distribute, market, supply, and/or sell the Fortnite video games, platform and all in-game downloadable products and in-game purchases contained therein to increase Defendants' revenue at the expense of consumers, including Plaintiff.

85.     Upon information and belief, each Defendant was aware—or should have been aware—that other game developers and publishers, including the other Defendants named herein, were engaging in the same behavior.

86.     Upon information and belief, Defendants Activision, Infinity Ward, Treyarch, Take-Two, Rockstar Games, Rockstar North, Blizzard, Epic Games, Epic Games Int'l, Ubisoft, Ubisoft Montreal, Mojang Studios, Microsoft, and Nintendo all acted in concert and entered into licensing agreements to utilize the same patents to keep users, including Plaintiff, addicted to Defendants' video games.

87.     At all times material hereto, each Defendant targeted consumers/purchasers, including minors like Plaintiff to (1) purchase and/or play its video games and (2) to purchase in-game items or perks in exchange for real money, known as "microtransactions," through in-game advertising and "fake" avatar friends.

88.     Each Defendant—with knowledge of Plaintiff's age and Georgia residency—targeted Plaintiff and induced Plaintiff to enter into microtransactions.

89.     Upon information and belief, each Defendant—with knowledge of Plaintiff's age and Georgia residency, allowed third parties to target Plaintiff and induce Plaintiff into microtransactions within Defendants' products.

90.     Upon information and belief, there may be individuals, corporations, or entities as yet unidentified to Plaintiff who were engaged in the research, development, manufacture, design,

testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions—and who introduced such products into interstate commerce or marketed such products with knowledge and intent that such products be sold in the State of Georgia—and who also may be liable for some or all of Plaintiff's injuries and damages as described herein. Despite reasonable and diligent inquiries by Plaintiff, the identity of said tortfeasor(s) has not been determined as of this date and, therefore, these potential tortfeasors cannot be identified as Respondents in discovery, and it is necessary to conduct discovery on Defendants in order to determine the identity of said tortfeasor(s). If a such a "John Doe" tortfeasor is identified for one or more causes of action, Plaintiff will amend this Complaint in accordance with Georgia law as provided in OCGA § 9-11-15.

### III.   **JURISDICTION AND VENUE**

91.     Plaintiff realleges and incorporate by reference each of the preceding paragraphs of the Complaint.

92.     This Complaint brings forth claims for relief arising under the laws of the State of Georgia, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce. Plaintiff has suffered and continue to suffer both injuries and damages, as described herein, within the State of Georgia that exceed the sum or value of $75,000, exclusive of interest and costs.

93.     This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

94.     This Court has personal jurisdiction over each Defendant because each routinely conducts business in Georgia and has sufficient minimum contacts in Georgia to have intentionally availed itself to this jurisdiction by marketing video games and transacting business in the State of

Georgia.

95.     At all relevant times, each Defendant was present and transacted, solicited, and conducted business in the State of Georgia through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

96.     Defendants are conclusively presumed to have been doing business in this State and are subject to Georgia's long arm jurisdiction.

97.     At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Georgia and throughout the United States.

98.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiff is a resident of this District and citizen of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## IV.     GENERAL ALLEGATIONS

### A.  The Rise of Video Games

99.     A "game" is a closed, formal system that engages players in structured conflict and resolves its uncertainty in unequal outcome.

100.    Video games are closed in the fact that once engaged in the game, the player sets aside their rules for daily life and accepts the rules of the game as the status quo.

101.    A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

102.    Unlike traditional arcade-style games, online video games require active, lengthy participation, during which players are exposed to psychological techniques designed to control, manipulate, and exploit minors' developing brains to increase game playing time and encourage in-game purchases.

103.    Such manipulation and exploitation are possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board.

104.    The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

105.    Yet, the industry is young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality platforms.

106.    Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time which resulted in a long and slow method of earning profits.

107.    A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

108.    Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games that can take hundreds of hours to beat, there is a staggering amount of gameplay available to users in modern video games.

109.    The video gaming market grew slowly, taking more than 35 years to reach $35

billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

110.    The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

111.    In 2023, the video game industry's revenue was $365.6 billion globally.

112.    With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases. Most of these purchases have been made by minors, including J.B.

113.    The explosive growth of the video game industry has been fueled by patented "monetization schemes" that target minors who are induced to make several in-game purchases, or "microtransactions," of downloadable products.

114.    Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the appropriateness of games.

115.    To entice minors to make such in-game purchases, video game developers and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money on microtransactions.

**B. Microtransactions**

116.    Instances where players are able to spend real money for in-game items or perks are known as "microtransactions" (sometimes abbreviated "mtx").

117.    The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly to meaningfully advance the game.

118.    Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

119.    Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

120.    Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

121.    While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

122.    Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

123.     In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

124.    Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

125.    Developers and publishers can also use microtransactions to lock potentially significant product upgrades and "easter eggs" designed to extend gameplay and increase a player's dopamine levels behind paywalls.

126.    Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

127.    The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

128.    This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

129.    This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

130.    Microtransactions were designed to use operant conditioning to ensure the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

131.    For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking will drive a player to make microtransaction purchases.

132.    Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

133.    Microtransactions are not only benefiting the gaming industry publishers and developers; the platforms that allow the microtransactions take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their platforms.

134.    While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young

adults.

135.    Each Defendant knows this, or should be aware of this, because they have purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

**C.  The Monetization Schemes Built into Video Games**

136.    Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

137.    The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

138.    Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

139.    Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

    a.   The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

    b.   "Chasing": encouraging players to keep playing to get back any money they just lost;

    c.   "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

    d.   "Exclusivity": suggesting that only a small number of a special prize are

available so it must be obtained immediately;

e.   "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; or

f.   The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

140.   The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

141.   Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

142.   Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game purchasing.

143.   Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game. This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

144.   Games linked to a game player's social network pages also gather information about players and Defendants use this information to target products and microtransactions to users

based on that player's unique interests and preferences.

145.    As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.,* spending or playing longer).

146.    The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm considers the player's available funds and cost sensitivity to certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

147.    As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

148.    Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals, and which lack basic transparency to the player, may have the potential to exploit certain types of vulnerable players under certain conditions.

149.    These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

150.    A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, pay-to-win models, and rubber-banding.

### i.  Loot Boxes

151.    A "loot box" is an in-game reward system that can be purchased repeatedly—with

real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

152.    Through purchasing a loot box, the player acquires a seemingly random assortment of items.

153.    The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

154.    Loot boxes require no player skill and have a randomly determined outcome (*i.e.,* prize).

155.    Loot boxes are essentially a lottery that provides a way for gaming developers, publishers, and even game platforms to increase revenue through underage gambling.

156.    It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

157.    After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

158.    Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

159.    Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

160.    Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

**ii. Rubber-Banding**

161.    Another example of a monetization scheme is "rubber-banding."

162.    Games have long employed rubber-banding to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

163.    Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

164.    In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

165.    If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

166.    Such technical sophistication in these purchasing systems aims to reduce the player's uncertainty or reluctance regarding purchasing decisions.

**iii. Pay-To-Win**

167.    Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.

168.    Players who are willing to shell out more money get a disproportionate advantage

over other players, particularly if the items cannot be obtained through free means.

169.   For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat for ordinary, non-paying players.

170.   Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

**D.  Patents Target Minors to Increase In-Game Spending**

171.   Several video game developers and publishers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

172.   Game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

173.   Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

    a.   U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character." Such an offer is referred to by Luchene as an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

    b.   U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her

behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

c.  U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d.  U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e.  U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

f.  U.S. Patent No. 8,702,523 B2, assigned to Microsoft, was created to capitalize on a player's tendency to commit to a purchase after investing significant time

into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with the patent:

    i.   Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

    ii.   The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

g.   U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h.  U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a player to keep their "avatar" charged by earning points by scanning codes on toys, through continued game play, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to play continuously as long as the player earns points playing the game, which is enhanced to allow the player to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

i.  U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.  U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a

time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k.  U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l.  U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m.  U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first

offer in order to incentivize early acceptance of the offer."

n.   U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o.   U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p.   International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, and send selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the

resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

174.    There was once a time when such lopsided consumer video game monetization-related inventions would have been patent ineligible. However, because of the introduction of these patents, game developers and publishers can further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

175.    The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

176.    It is common practice for developers and publishers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

**E.  These Predatory Monetization Schemes Attract "Whales" to Defendants' Games**

177.    What players and parents, including Plaintiff, often do not understand is that their gaming experience is not accidental, but rather carefully engineered by the game's manufacturers.

178.    In every game, there are several hundred, or maybe even thousands, of heavy playing users who spend much more money in the game than the other players.

179.     Companies employ tactics specifically to gain heavy playing users—or "whales" or "VIPs"—and to induce them into spending more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

180.    Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

181.    To target those who may be likely to spend additional money in the game, developers and publishers, like Defendants, will monitor players and collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

182.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

### F.  Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted

183.    In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, artificial intelligence (AI), feedback loops, continuously adding new game content, and using tactics to ensure users are creating habits in their gameplay.

184.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

185.    For instance, Activision holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[1]

186.    Upon information and belief, Activision works in concert with the other Defendants to license this patented technology and allow all Defendants to control users' experiences within the game.

---

[1]    *See* Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

187.   Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

188.   Feedback loops are systems where the game reacts to how well the player is doing to make the games more rewarding, or for tougher games, more challenging.

189.   Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

190.   There are two kinds of feedback loops: positive and negative.

191.   Positive feedback loops mean that when a player is doing well, the game rewards them with things to help them do even better.

192.   Negative feedback loops, on the other hand, add a challenge to a game when players are doing too well.

193.   Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

194.   By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

195.   A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed using negative feedback loops.

196.   When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

197.   In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players

playing longer.

198.     Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

199.     Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

200.     Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

201.     Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

202.     By constantly adding downloadable content, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the content and the game.

**G. Dark Patterns and Drip Pricing Have Allowed Defendants to Further Exploit Users**

203.     For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find-and-read disclosures, and confusing cancellation policies, to get consumers to hand over their money or data.

204.     The term "dark patterns" was coined in 2010 by user design specialist Harry Brignull to describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have

otherwise made.

205.    The purpose behind "dark patterns" is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions.

206.    Research shows that "dark patterns" are highly effective at influencing consumer behavior.

207.    The use of these manipulative design practices, or "dark patterns," has only grown in scale and sophistication as more and more commerce has moved online, thereby creating ever greater challenges for consumers.

208.    Further challenging consumers is the common practice of using multiple "dark patterns" in combination, rather than in isolation.

209.    "Dark patterns" tend to have even stronger effects when they are combined, so they are rarely used in isolation.

210.    "Dark patterns" have a compounding effect, thereby increasing the impact of each and exacerbating the harm to the consumer.

211.    The use of manipulative design techniques, including "dark patterns," in the digital world can pose heightened risks to consumers. For example, the pervasive nature of data collection techniques, allows companies to gather massive amounts of information about consumers' identities and online behavior, enabling businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.

212.    Companies that market online can experiment with digital dark patterns more easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior. For example,

online a company can easily and quickly rearrange products to mimic the consumers' behaviors, but also can easily test new marketing practices and digital dark patterns on consumers, deceiving consumers or manipulating them into taking unwitting or detrimental actions.

213.    Some dark patterns manipulate consumer choice by inducing false beliefs—such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level.

214.    Other dark patterns operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

215.    Free-to-play or "freemium" games are an example of games that fail to disclose to a minor that a game they purchase is not the entire game.

216.    Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process.

217.    Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction.

218.    Microtransactions built into many video games by design are a form of drip-pricing.

219.    Each Defendant uses, or has used at relevant times, "dark patterns" in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of their respective gaming products.

### H. Cloud Gaming Enhances Defendants' Predatory Activities

220.    Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

221.    Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

222.    Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

223.    Cloud gaming platforms allow users to stream any game available on the platform at any time.

224.    Cloud gaming eliminates the need for users to purchase expensive computer hardware or install games directly onto a local game system.

225.    This means players have easy access to hundreds or even thousands of games at one time.

226.    What's more, the catalogue of games on streaming platforms is ever-changing and evolving.

227.    The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming platform, by ensuring they always have something new and different to play.

**I.    Defendants' Predatory Schemes Created a Generation of Gaming Addicts**

228.    The feedback loops, other psychological properties, and cloud gaming platforms are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, platforms, and predatory monetization schemes work together to addict players to

the games.

229.    During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[2]

230.    In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[3]

231.    Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, and occupational responsibilities.

232.    IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

233.    Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

234.    IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative

---

[2] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis*. 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).
[3] *Id.*

consequences.

235.    The main features of gaming disorder are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

236.    The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

237.    Gaming disorder is the only behavioral addiction recognized in the DSM-5.

238.    The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

239.    Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

240.    The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

241.    For instance, IGD may be an impulse control disorder like compulsive gambling.

242.    The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use

of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

243.    These nine criteria are also outlined in the DSM-5.

244.    Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

245.    The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

246.    The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

247.    The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

248.    The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

249.    Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

250.    The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

251.    Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

252.    These statistics are even higher for minors: 8.5% of youths aged between 8 and 18

suffer from gaming disorder.

253.    Comorbidity studies also indicate that individuals with ADHD may have an increased susceptibility to developing gaming disorder.

**J.  Effects of Video Games on Adolescent Brains**

254.    Research has shown prolonged gaming damages the prefrontal cortex, causing a loss of grey matter, lower cognitive function, and inability to regulate impulse control.

255.    Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

256.    Clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

257.    In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the U.S.

258.    Empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

259.    Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

260.    Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

261.    The prefrontal cortex—the locus of judgment, decision-making, and impulse

control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

262.    The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

263.    This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

264.    Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[4]

265.    Brain activation studies have shown that videogame playing involved changes in

---

[4] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

reward and loss of control, and that gaming pictures activate regions similar to those activated by cue-exposure to drugs.

266.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure.



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[5]

267.    Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

268.    One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

269.    Research has shown that a minor with a diagnosis of ADHD, autism, or ODD is at a higher risk of video game addiction, worsening of ability to control impulsivity, and brain damage.

270.    Research has shown that while video games may foster creativity in children, such

---

[5] *Id.*

benefits are outweighed by the negative aspects of addiction, which develop quickly in children and neurodivergent individuals exposed to video games for extended periods of time.

271.    Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

272.    These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

273.    As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

274.    As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

275.    By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiff seeks to hold them accountable.

**K.  Plaintiff's Addiction, Injuries, and Damages**

276.    Plaintiff is a 19-year-old individual addicted to video games; specifically, Plaintiff is addicted to playing COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, Grand Theft Auto 5, Overwatch 2, Fortnite, Rainbow Six, and Minecraft.

277.    Plaintiff plays across multiple platforms, including Xbox One, a gaming pc and Nintendo Switch.

278.    Plaintiff spends approximately 12 hours per day using Defendants' products to play video games.

279.    Plaintiff cannot refrain from gameplay and/or spending money while using Defendants' products.

280.    Plaintiff suffers from Anxiety, Internet Gaming Disorder, Sleep Deprivation,  and has also experienced the following as a result of the brain damage, gaming addiction and harm caused by Defendants' products: e.g., inability to limit game playing time, lack of interest in and loss of friends, social isolation, change in eating pattern, withdrawal symptoms (e.g., anger, cursing, physical outbursts).

281.    As a result, Plaintiff is taking medication for anxiety and withdrawal symptoms.

**L.  Defendants' Conduct Specifically Led to Plaintiff's Damages**

282.    Each Defendant is aware that its video games are harmful to minors and young adults because each Defendant specifically designed its products to addict and prey upon those users' developing brains.

283.    To this avail, each Defendant employs behavioral psychologists and/or neuroscientists to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

284.    Due to the psychological aspects of the games, many of Defendants' products have been banned in other countries to avoid the harm to children that all Defendants are causing daily in the United States.

285.     No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including Plaintiff.

**M.  Defendants' Products Used by Plaintiff**

**<u>Call of Duty</u>**

286.     Call of Duty is a first-person shooter game series that simulates infantry and combined arms warfare.

287.     Call of Duty was first released in 2003; however, the COD Defendants release annual versions of the game.

288.     Currently, there are 22 mainline versions of the Call of Duty video game available for play on Microsoft's Xbox game consoles, Sony's PlayStation game consoles, Android and iOs based mobile devices, personal computers, and Nintendo's game consoles (excluding the Nintendo Switch).

289.     Each Call of Duty version has been published by Activision, with design and development coming from Infinity Ward (2003 to present), Treyarch (2005-present), Sledgehammer Games (2011 to present), and Raven (2016 to present).

290.     Call of Duty is the most successful video game franchise created in the United States, and the fourth best-selling video game franchise of all time.

291.     As of April 2021, the series has sold over 400 million copies.

292.     Each version of Call of Duty is based on the same design and incorporates largely similar product components, varying mostly with respect to the version's storyline, guns, and abilities.

293.     Call of Duty offers both single-player and multiplayer modes.

294.     While there are several multiplayer shooter games on the market, Call of Duty is popular because it is designed and developed with specific, addictive features.

295.   For instance, Call of Duty involves unlock progression, wherein each kill, assist, or win all seep into a feedback loop that unlocks new equipment as players progress.

296.   Similarly, each gun used gets better the more a player uses it, with new attachments becoming available with more points scored.

297.   The rewards built into the Call of Duty games are immediate and are a constant stream of progression, or feedback loop, that allows players to feel they are making constant progress toward unlocking everything in the whole game.

298.   The COD Defendants designed the Call of Duty games with these feedback loops—a form of operant conditioning that is harmful to youth and neurodivergent individuals—to target the chemical reward receptors of game user's brains.

299.   With operant conditioning like feedback loops, players are reinforced to enact the correct behavior: in this case, making "kills" to earn extra game content.

300.   Combining these addictive feedback loops with fast-paced play, satisfying graphics, sounds, and other dopamine lifts make the Call of Duty franchise extremely addicting to players, particularly minors and neurodivergent individuals.

301.   The COD Defendants and Microsoft were aware that the Call of Duty games included significant psychological aspects to encourage continuous game play and eventually lead to the addiction of its plays—especially minors and neurodivergent individuals.

302.   The COD Defendants specifically designed the Call of Duty games in concert with psychologists and neuroscientists to discover the best addictive aspects to include in the design of their video game.

303.   Activision patented several of these addictive technological features used in the Call of Duty games.

304.    Upon information and belief, the COD Defendants and Microsoft have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Call of Duty games.

305.    The COD Defendants also utilize several schemes to increase game time, consequently increasing in-game spending on downloadable content and microtransactions.

306.    Several of the Call of Duty versions include loot box schemes, and others include "battle passes" which allow users to unlock additional tiers of game play for a certain price:

> If you've already experienced the full version of *Call of Duty®: Black Ops Cold War* or *Modern Warfare®*, you are probably familiar with the Battle Pass system. For those that aren't, here's how it works:
>
> The Battle Pass has 100 tiers of content for you to progress through and earn once you've purchased the Battle Pass.
>
> To advance through these tiers, you simply play the game (either *Warzone*, *Black Ops Cold War*, or *Modern Warfare*). The longer you play, the more Tier progress you get. Sometimes, there are events where Double Tier progress can be gained, and it does exactly what you'd expect; double the rate at which you get Battle Pass Tiers through time played.
>
> Through the Battle Pass system, everyone can unlock and enjoy tiers of free content, and all functional content that has an impact on game balance, including base weapons and attachments, can be unlocked simply by playing the game.
>
> So, to recap: you play the game, you get Battle Pass Progress which unlocks Tiers, and then you get rewards from Tiers. Yes, it's that simple. [6]

307.    While users can play 20 of the 100 levels for free, to continue gameplay through additional "tiers," a user has to pay 1,000 "Call of Duty Points" which equates to $9.99 in real-world funds:

---

[6] https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

**Free Tiers (of the Battle Pass system):** Everyone can earn over 20 free tiers of content, including two functional weapons just by playing.

**Wartracks:** Among the rewards that can be earned at specific Free Tiers are Wartracks, packs of popular songs from the *Call of Duty* universe and in the real world! Equip a track to a specific vehicle in the Vehicle Customization menu (like Battle Horns), then as soon you hop in, the music gets turned up. Your entire squad can listen to the beat while you drive, and let the song guide you to your primary objective – survival.

**Battle Pass:** Players looking for the ultimate customization can purchase the Battle Pass for 1,000 *Call of Duty* Points and get access to unlock up to 100 tiers of content. These Tiers include scores of Rare, Epic, Legendary, and occasionally Ultra weapon blueprints, Operator skins, Operator Missions, and more, including a new Operator at Tier 0 most, if not all, seasons.

**Dual Reward Tiers:** Some tiers within the Battle Pass include two rewards: one for *Black Ops Cold War* and one for *Warzone*. These are marked within the Battle Pass, offering those who own *Black Ops Cold War* with their own special item in addition to one they can use in *Warzone*.

**Battle Pass Bundle:** Purchase the Battle Pass Bundle and get access to everything you get with the Battle Pass, plus 20 Tier skips which grant instant access to your next 20 tiers of content.

**Tier Skips:** Buy individual Tier skips for 150 COD Points.

You can purchase at any time without missing any content. If you choose to purchase the Battle Pass after already ranking up a few tiers, no problem: You'll immediately be awarded everything from the Tiers you have already unlocked through gameplay.[7]

308. The COD Defendants have designed the game to include microtransactions, which include loot box microtransactions known as "Advanced Supply Drops," that are earned through gameplay or are purchasable through in-game stores.

309. The COD Defendants first introduced microtransaction as part of their Call of Duty video games in 2018, but with the release of *Call of Duty: Modern Warfare* in 2019, microtransactions—and specifically Advanced Supply Drops—became a key design component of the Call of Duty video game series.

310. The COD Defendants target players with Advanced Supply Drops and other microtransactions utilizing patented technology and undisclosed trackers embedded in the game.

311. Advanced Supply Drops encourage players to bolster their Armory and customize their Operator. More specifically, the COD Defendants use Advanced Supply Drops to keep players, particularly minors, engaged and spending Call of Duty Points[8] on these microtransactions.

---

[7] https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

[8] Call of Duty Points are a form of in-game currency that have been purchased using real world money, a gift card, a rewards code, or Depot Credits (which are points earned by playing the game).

312.    Each Advanced Supply Drop microtransaction includes three random loot items, with a guarantee of at least one weapon variant and at least one item of Professional rarity or greater.

313.    Items purchased during an Advanced Supply Drop can either be used to upgrade loadouts and personalize an Operator or can be redeemed for experience points, or "XP."

314.    The COD Defendants and Microsoft include Advanced Supply Drops in the game was because they want players to be engaged and spending money in the game for a long time, and they knew that these impulse and "special" prizes would play on users' psyche and mental stage of development.

315.    The COD Defendants have also launched a Call of Duty App as a companion product for the game.

316.    The COD Defendants have made the Call of Duty App available to minors and adults indiscriminately.

317.    The Call of Duty App provides announcements of upcoming tournament events, links to E-Sports betting sites, and publishes the gaming stats of users, including minors—and to do so it tracks users' game usage and collects other data from those users, including minors:



318.    Though the COD Defendants and Microsoft know of the addictive features and technology included in the Call of Duty games, such as those features and technologies described herein, they do not inform their users of the risks inherent with playing this game.

319.    The COD Defendants and Microsoft do not adequately inform users of the inherent risks involved with using and playing Call of Duty or that the game was designed to addict and harm users.

**Grand Theft Auto V**

320.    Grand Theft Auto is a series of action-adventure games focusing on an open game world where players complete missions to progress an overall story, as well as engage in various side activities.

---

[9] https://www.callofduty.com/blog/2018-09/welcome

321.     The Grand Theft Auto video game series is primarily designed and developed by Rockstar North and published by Rockstar Games, with both companies being controlled and operated by Take-Two as wholly owned subsidiaries.

322.     The GTA Defendants released the first Grand Theft Auto video game in 1997, and since then has released five versions of the game.

323.     Grand Theft Auto has been played by over 30 million individuals.

324.     Grand Theft Auto V ("GTA V"), released in 2013, is the second-best selling video game of all time with over 190 million copies shipped and sold to consumers.

325.     In total, the Grand Theft Auto franchise has generated over $8.33 billion in revenue since Grand Theft Auto V's launch in 2013.

326.     The Grand Theft Auto video games, including GTA V, can be played on Microsoft's Xbox and Sony's PlayStation gaming consoles, personal computers running Microsoft Windows, and mobile devices.

327.     In developing GTA V, the GTA Defendants designed the video game to take advantage of and push the graphical capabilities of Microsoft and Sony's video game console systems.

328.     The GTA Defendants also designed, developed, and released an online version of Grand Theft Auto, Grand Theft Auto Online.

329.     Grand Theft Auto Online, released in 2013, is an online multiplayer mode that the GTA Defendants designed and developed to work in tandem with the single-player mode and to provide user's extended play in a continually evolving world.

330.    Each game in the Grand Theft Auto series centers on a different respective protagonist who attempts to rise through the criminal underworld due to various motives, often accompanying themes of betrayal.

331.    Several film and music celebrities have voiced characters in the game.

332.    The Grand Theft Auto Defendants have designed the games with good graphics, a captivating storyline, and smooth and predictable controls to enhance players' gaming experience.

333.    Grand Theft Auto also includes endless arrays of activities and challenges to continually engage users and ensure they are never bored.  From skydiving, playing darts, watching movies, and even arm wrestling, the games have near limitless things for players to do to keep them rapt for a long time.

334.    Additionally, Grand Theft Auto gives players a chance to "drive" their dream car around this fictional world with unmatchable replicas of famous supercars; the quality designs of these cars combined with speedy performance and crisp controls encourage players to play longer and/or spend more money in order to obtain the flashy cars, guns, and clothes in the game.

335.    Grand Theft Auto allows users to play in different game modes—either completing free mode missions or competing in different adversary modes.

336.    One such adversary mode is the opportunity to race other individuals online, with different classes of vehicles and different areas of the game map.  The unlimited possibilities of track layouts across the entire map, as well as the element of competition, give players variety and the dopamine rush to keep playing.

337.    The game rewards players who win these races and other adversary challenges with in-game currency and other rewards.

338.     During certain weeks or special events, the adversary modes reward winners with double, triple, or even quadruple rewards—encouraging players to increase their play time and play each time these special event times.

339.     Players do not have to just compete against others, however; the games also offer cooperative modes where friends can carry out missions or "heists" together in the storyline.  The ability to play with friends—and/or the pressure from friends to play the games—is another reason why so many individuals play Grand Theft Auto video games.

340.     After earning in-game "money" through missions and activities in the game—or by purchasing the in-game funds with real-world money—players can use these funds to buy additional guns, clothing, accessories, and even cars in the Grand Theft Auto games.

341.     In some versions of the game, players can visit in-game "websites" on their character's mobile phone to purchase these items—including high-end luxury vehicles.



342.     In addition to the downloadable product upgrades available for purchase in the game, the GTA Defendants also release occasional free in-game upgrades or prizes to keep players coming back for more.

---

[10] https://www.gamespot.com/articles/how-to-buy-cars-in-gta-online/1100-6502358/

343.    Each day players login to play, Grand Theft Auto provides them with daily objectives to complete for even more in-game funds and progress points.

344.    The GTA Defendants know that all of these features in their games work together to addict users and further abuse and compulsive use of the games.

345.    The GTA Defendants specifically developed their games along with psychologists and neuroscientists to include such addictive psychological traits.

346.    By encouraging users to keep playing the game and build habits around it, the GTA Defendants know that players are more likely to spend real-world funds within the game.

347.    At the expense of users' mental and physical well-being, the GTA Defendants fail to inform the public, users, or parents that the game was designed to addict and harm users or of the inherent risks or negative consequences that can arise from playing their game.

348.    The GTA Defendants intend to introduce and addict as many users as possible in order to increase their own profits as these users continue playing—and spending.

349.    Though the GTA Defendants know of the addictive features and technology included in the Grand Theft Auto games, such as those features and technologies described herein, they do not inform their users of the risks inherent with playing this game.

350.    The GTA Defendants do not adequately inform users of the inherent risks involved with using and playing Grand Theft Auto, or that the game was designed to addict and harm users.

**Overwatch**

351.    Overwatch is a series of first-person shooter video games featuring hero-based combat set sixty years into the future on a fictionalized Earth.

352.    Overwatch is developed and published by Blizzard, a subsidiary of Activision.

353.   The Overwatch Defendants work in concert to create the Overwatch games that ultimately reach consumers, like Plaintiffs.

354.   Overwatch can be played on PC and various gaming consoles, including PlayStation, Xbox, and Nintendo Switch.

355.   The initial Overwatch game was first released in 2016, with a sequel, Overwatch 2, released in 2022.

356.   Overwatch 2 currently averages 1.7 million players a day, and has garnered over 24 million active users in the last 30 days.

357.   In the first year of Overwatch's release, Blizzard reported over $1 billion in revenue.  Overwatch 2 earned over $100 million in the first three months after its release, and is currently in the top 10 games in terms of revenue on the Steam platform.

358.   Unlike most other video games, when Overwatch was first released, it lacked a traditional story mode.  Instead, Blizzard employed a transmedia storytelling strategy to disseminate lore regarding the game's characters through comics, other literary media, and animated media including short films.

359.   Overwatch has been listed by various outlets as one of the best video games of all-time.

360.   This is due, in part, to Overwatch's inclusive multiplayer atmosphere, which appeals to both new and casual players and more competitive and expert players alike.

361.   The game also employs a vibrant world and characters to draw in new users.

362.   Overwatch combines quick-fix, objective-based gameplay with a deep tactical core to form a game that is perfect for players to engage in short bursts *or* for hours at a time.

363.     Thus, a minor or young adult with only a short amount of free time may turn to Overwatch to play a little each day, forming addictive habits, and eventually playing for hours on end.

364.     In order to draw players each day, Overwatch offers periodic login rewards for users who play consistently, as well as seasonal events in the game.



365.     Players are also drawn to the game through comics, animated shorts, and other media describing the characters' backstories; in turn, the game is recognizable to even new players, but with varied and interesting gameplay aspects that keep users engaged.

366.     The initial Overwatch game included loot boxes for players to purchase.

367.     Overwatch 2 replaced loot boxes with a Battle Pass and in-game microtransactions. In fact, certain cosmetics in the game can take a tremendous amount of play to earn enough in-game currency to unlock, encouraging users to spend their own money for these items.

---

[11] https://us.shop.battle.net/en-us/family/overwatch#battle-pass



368.    The Overwatch Defendants know that all of these features in their games work together to addict users and further abuse and compulsive use of the games.

369.    The Overwatch Defendants specifically developed their games along with psychologists and neuroscientists to include such addictive psychological traits.

370.    Upon information and belief, the Overwatch Defendants also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Overwatch games.

371.    By encouraging users to keep playing the game and build habits around it, the Overwatch Defendants know that players are more likely to spend real-world funds within the game.

372.    At the expense of users' mental and physical well-being, the Overwatch Defendants fail to inform the public, users, or parents that the game was designed to addict and harm users or of the inherent risks or negative consequences that can arise from playing their game.

373.    Instead, the Overwatch Defendants intend to introduce and addict as many users as possible in order to increase their own profits as these users continue playing—and spending.

---

[12] https://us.shop.battle.net/en-us/family/overwatch#battle-pass

**Fortnite**

374.    Fortnite is an online video game and game platform designed, developed and published by the Fortnite Defendants.

375.    Fortnite, first released by Epic Games in 2017, is available to public to play in six distinct game mode versions: *Fortnite: Save the World, Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*.

376.    *Fortnite: Save the World*, released as a paid early access game in 2017 and as a premium game in 2020, is a player-versus-environment, cooperative hybrid tower defense-shooter and survival game in which up to four players collaborate fight off zombie-like creatures and defend objects with traps and fortifications they can build.

377.    In *Fortnite: Save the World*, players work together on missions while fighting off zombie-like creatures and avoiding the effects of an encroaching cataclysmic storm, and, based on the success of the missions, players are awarded a number of in-game items, which includes but is not limited to hero characters, weapon and trap schematics, and survivor rewards, which can be leveled up through gained experience, to improve gameplay.

378.    *Fortnite Battle Royale,* released in 2017 as a free game supported by microtransactions, is a player-versus-player, battle royale game that a user—playing alone, in a duo, or in a 3-4 player squad—fights against up to 100 other players to be the last person (or team) alive.

379.    In *Fortnite Battle Royale,* after being airdropped weaponless from a "Battle Bus" into the game's map, game players must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other players—all while the safe area of the map shrinks down in size due to an incoming toxic storm.

380.     *Fortnite Creative*, released in 2018, is a survival sandbox game mode that allows users to create games such as battle arenas, racecourses, and platforming challenges; gives users complete freedom to "spawn" or create any item from *Fortnite Battle Royale* on a personal island; and supports Unreal Editor for Fortnite so that players can edit worlds using Fortnite assets.

381.     *Lego Fortnite*, released in December 2023 and developed by Epic Games with the Lego Group, is a survival sandbox game that provides game players the opportunity to play as Lego Minifig versions of characters as they collect materials, build various buildings, craft various weapons and tools, and fight monsters.

382.     *Rocket Racing,* released in December 2023 and developed by Epic Games with Psyonix as a spin-off title to *Rocket League*, is a Fortnite game mode that allows players to race vehicles, gaining speed boosts from special lanes sections or by drifting, as well as the ability to jump and racing on vertical and inverted surfaces, while avoiding obstacles on the course.

383.     *Fortnite Festival*, released in December 2023 and developed by Epic Games with Harmonix, is a rhythm game in which the user can either play (a) the "Main Stage" hitting notes in a rhythm as either Lead, Guitar/Bass, Drums, or Vocals, or (b) the "Jam Stage" cooperating with other players to make remixes using any part of any song built into the game design.

384.     *Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes interface with Fortnite's battle pass system, include microtransactions, and offer new rewards associated with each distinct game mode.

385.     All Fortnite game modes, while offering different content, share the same general gameplay design and are powered by the same game engine (Unreal Engine)—all of which have been internally developed and made available by the Fortnite Defendants.

386.    Each Fortnite game mode uses similar graphics, art assets, and game mechanics designed and developed by the Fortnite Defendants.

387.    *Fortnite: Save the World* is a pay-to-play video game product that is available for play on PlayStation 4, Xbox One, and personal computers running macOS or Windows.[13]

388.    All other Fortnite versions—*Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*—are free-to-play video game products available for play on all available gaming consoles, including Sony's PlayStation 4 and PlayStation 5, Microsoft's Xbox One and Xbox Series X/S, and Nintendo's Switch.

389.    The *Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes also can be played on Android and iOS mobile devices, as well as personal computers running macOS or Windows.[14]

390.    *Fortnite Battle Royale,* and the other Fortnite game modes, can be downloaded and played for free through Microsoft's Xbox Cloud Gaming without need for a Xbox Game Pass subscription:



YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS.[15]

---

[13] In 2020, due to legal battles between Epic Games and Apple, Inc., the macOS client of *Fortnite: Save the World* remained downloadable and players who had downloaded the game for play using a macOS client could still play then game, however, it would not be updated.  Since May of 2022, *Fortnite: Save the World* has been available for play via Xbox Cloud Gaming and GeForce Now on macOS devices.

[14] In 2020, the iOS and Android clients of *Fortnite Battle Royale* were removed by Apple, Inc. and Google, LLC—and became unavailable on certain mobile phones—as a result of legal battles between those companies and Epic Games. The game remained playable if it had already been downloaded on mobile devices running either an iOS or Android client.

[15] https://www.fortnite.com/mobile/xbox-cloud-gaming

391.   Fortnite is also available to download for free on multiple video game platforms with the Epic Games Store app or Valve's Steam app.

392.   All Fortnite game modes are cross-platform play compatible, but to use that option, product users are required to have an Epic Games account for cross-saving between platforms.

393.   All Fortnite game modes are monetized through the use of V-Bucks, an in-game currency that can be purchased with real-world funds.

394.   In *Fortnite: Save the World,* V-Bucks also can be earned through completing missions and other achievements.

395.   In *Fortnite: Save the World,* V-Bucks can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

396.   In all other Fortnite game modes, including *Fortnite Battle Royale*, V-Bucks can be used to buy cosmetic items like character models.

397.   In *Fortnite Battle Royale,* V-Bucks can be used to purchase a battle pass, which is a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a *Battle Royale* season.

398.   Epic Games developed Fortnite games to make sure that the players keep coming back and playing Fortnite.

399.   In the first two weeks of the release of *Fortnite Battle Royale*, there were over 10 million people playing the game.

400.   In June of 2018, less than a year after the release of *Fortnite: Save the World, Fortnite Battle Royale,* and *Fortnite Creative*, there were more than 125 million Fortnite players and Epic Games's monthly earnings totaled hundreds of millions of dollars.

401.    From 2017-2019, Fortnite video games have generated over $9 billion in gross revenue through microtransactions and in-game purchases.

402.    In 2021 alone, Fortnite generated $5.8 billion in revenue.

403.    Fortnite has an average of 239 million monthly players, and a potential peak of 15 million players in a day.

404.    Fortnite gained immense popularity because of its clever manipulation of human psychology.

405.    The team that developed Fortnite included psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a game that was as addictive as possible.

406.    One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what stopped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

407.    The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

408.    In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

409.   Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule"—the idea that randomized small wins will continue to draw in users.

410.   With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

411.   Additionally, the design of Fortnite purposefully keeps players drawn in. For instance, the bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

412.   Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more—an intentional design through which the Fortnite Defendants ensure that Fortnite players never once get bored during gameplay.

413.   To keep players even more engaged, the Fortnite Defendants often roll out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well.

414.   Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:



16

---

[16] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

415.    Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

416.    These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

417.    Upon information and belief, the Fortnite Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

418.    The Fortnite Defendants have failed to disclose the risks of harm purposefully built into its game.

419.    The Fortnite Defendants do not disclose any of the psychological tactics or addictive features they purposefully include in Fortnite to any of their users.

420.    Several studies have concluded that Fortnite is more addictive than heroin and other illegal drugs.

421.    The Fortnite Defendants do not warn the public that its Fortnite game products are addictive and likely to cause brain damage, particularly in minors and neurodivergent individuals, when used as intended.

422.    The Fortnite Defendants tout their game as "educational" and markets it for use in the classroom, including but not limited to offering "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



423.    Engaging—and addicting—children early and in environments such as their classroom serves only to increase the Fortnite Defendants' revenue through continued play of young users, at the expense of these users' mental and physical health.

424.    The Fortnite Defendants do not adequately inform users of the inherent risks involved with using and playing any Fortnite video game products.

425.    None of the game modes in the Fortnite game series includes a warning that the game was designed to addict and harm users.

**<u>Rainbow Six</u>**

426.    Tom Clancy's Rainbow Six is an online tactical shooter video game developed by Ubisoft Montreal and published by Ubisoft.

427.    The game is based on the novel Rainbow Six by author Tom Clancy and was first released in 1998 for PC.

428.     The series today consists of over 20 separate games, in which players travel around the world hunting down terrorists as part of a global anti-terrorist unit.

---

[17] https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

429.     Ubisoft confirms that, as of 2021, the Rainbow Six Siege version of the series had over 70 million registered players across platforms.

430.     In Ubisoft's 2021-2022 investor report, it stated that the Rainbow Six game series generated €300 million, or nearly $317 million, throughout the year across licensing agreements and raw sales.

431.     In the popular Rainbow Six Siege game, released in 2015, Ubisoft included microtransaction models in the game.

432.     While the maps and game modes continue to be available for free, new characters and weapon skins require in-game currency known as "Renown" to purchase.

433.     Players can accumulate Renown by playing the game but can also purchase Renown with real-world funds.

434.     "R6 Credits" are another in-game currency that can be purchased with real money to obtain premium weapon skins in the game.

435.     Unlike Renown, R6 Credits cannot be obtained through other means within the game.

436.     Credit packs are available in varying amounts at varying costs; 600 credits cost $4.99, 1,200 credits cost $9.99, 2,400 credits cost $19.99, 4,200 credits cost $34.99, 6,000 credits cost $49.99, and 12,000 credits cost $99.99.

437.     The first credit pack of 600 credits is essentially enough to purchase one seasonal operator or an epic weapon skin within the game.

438.     Elite skin bundles in the game cost 1,800 R6 Credits, and conveniently, there are no credit bundle packs for 1,800 credits—meaning a user would have to purchase a 2,400-credit pack to purchase an elite skin bundle in the game.

439.     Thus, the credit bonuses that one can get by buying expensive currency packs incentivizes people to buy more in order to obtain more downloadable content within the game.

440.     The Rainbow Six Defendants intentionally developed the game with addictive psychological features to keep users playing more often and for longer periods of time.

441.     Upon information and belief, the Rainbow Six Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Rainbow Six games.

442.     Specifically, the game is set up such that no two game-play sessions are the same; within the game there are multiple map entry points and places for players to explore that the game is constantly changing and a different experience for players every time.

443.     Such constant variety keeps players hooked and coming back daily and playing for hours.

444.     Moreover, the amount of time it takes to "level up" within the game increases significantly over time, causing players to spend more and more hours to achieve the same experience of "leveling up."

445.     Players are also afforded only one life per round, making players pay closer attention to the game in each match, use significant mental capacity in an effort to try and win, and frustrate players all the more with each loss.

446.     Though they are equipped with the knowledge of the addictive risks inherent in their game, the Rainbow Six Defendants have failed to inform the public, users, or parents of such risks.

447.    The Rainbow Six Defendants know that many users—like Plaintiff—play in excess, but rather than discourage such play, the Rainbow Six Defendants profit off their continued game time and spending.

448.    The Rainbow Six Defendants do not adequately inform users of the inherent risks involved with using and playing Rainbow Six or that the game was designed to addict and harm users.

**Minecraft**

449.    Minecraft is a 3D sandbox video game first developed and published by Mojang who made the video game available to the public in 2009, prior to a full release on November 18, 2011.

450.    Minecraft can be played on PC, various gaming consoles, and mobile devices.

451.    Since the first full release of Minecraft in 2011, the video game has been continuously updated with many major and minor product update, including but not limited to gameplay-altering mechanics, new product content and items, microtransactions, and tweaks to existing product features, which are available free to users who have purchased the game.

452.    In May of 2012, Mojang and Microsoft, acting through its video game design and publishing studio, Xbox Game Studios, released Minecraft for play on Xbox 360 and as the flagship game to play with friends via Microsoft's new Xbox Live feature.

453.    The Xbox 360 version of Minecraft, like the product versions that came later for play on other gaming consoles or updated Xbox consoles, differed from the personal computer version of Minecraft in many ways, including but not limited to a newly designed crafting system, the control interface, in-game tutorials, split-screen multiplayer, and the ability to play with friends over the internet.

454.    With the introduction of Minecraft as a video game product for play on gaming consoles like Xbox 360, the Minecraft Defendants introduced microtransactions and made in-product downloadable content available for purchase.

455.    All Minecraft versions since 2012 have been designed to include microtransactions and on-going product updates to enhance game play and keep players engaged in the product.

456.    In December of 2013, Mojang and Sony Interactive Entertainment, LLC released Minecraft for play on PlayStation 3.

457.    Microsoft acquired Mojang and all product rights to Minecraft in 2014.

458.    That same year, Minecraft was made available for play on Xbox One and PlayStation 4.

459.    In 2015, Minecraft was made available for play on the Wii U, which is a gaming console product designed, manufactured, and sold by Nintendo of America, Inc.

460.    In May of 2017, Minecraft was made available to play on the Nintendo Switch, and then in September of 2017 for Nintendo 3DS.

461.    On September 20, 2017, the Minecraft Defendants released a *Better Together Update* for Xbox One, Windows 10, VR, and mobile versions, which enabled cross-platform play between those products and became known as the *Bedrock Edition* of Minecraft.

462.    The *Bedrock Edition* was also provided as a product update to the Nintendo Switch version of Minecraft in 2017, thereby enabling cross-platform play between the Nintendo Switch, Xbox One, virtual reality gaming headsets, mobile devices, and personal computers.

463.    In December of 2019, the PlayStation 4 version of Minecraft was updated to become part of the *Bedrock Edition*, thereby enabling cross-platform play for users with a Xbox Live account.

464.    The *Bedrock Edition* of Minecraft is the most commonly available and played version of the product, allowing cross-platform play with Microsoft's Xbox One and Xbox Series X/S, Sony's PlayStation 4 and PlayStation 5, Nintendo's Switch, personal computers, mobile phones, and virtual reality gaming headsets.

465.    Minecraft is the best-selling video game to date, with over 300 million copies of its games sold.

466.    Minecraft has over 163 million monthly active players.

467.    Regardless of version or platform, Minecraft gameplay is designed with no required goals to accomplish thereby allowing players extensions freedom in exploring virtually infinite terrain within a blocky, procedurally generated, three-dimensional world.

468.    While there are no set goals, Minecraft does include an achievement system and can earn "advancements" in the *Java Edition,* "trophies" when playing on PlayStation consoles, and "achievements" in *Bedrock Edition* and when playing on Xbox consoles.

469.    Minecraft players can discover and extract raw materials, craft tools and items, and build structures and machines; however, the core gameplay revolves around picking up and placing block-objects in a 3D grid.

470.    In Minecraft, the game world is virtually infinite on a horizontal plane and procedurally generated based on a players exploration, using a map seed that is obtained from the system clock at the time of world creation.

471.    Although a single video game product, Minecraft gameplay can be different each and every time a player logs in to play.

472.    Minecraft includes multiple game modes for a variety of gameplay, including but not limited to, survival mode, in which players must acquire resources to build in the world and maintain health, and creative mode, in which players have unlimited resources and access to flight.

473.    Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world.

474.    When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard."

475.    Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play.

476.    Each player's main task in Minecraft is to survive all the problems using specific resources.

477.    When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling.

478.    The Minecraft Defendants designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world, which combined with the technologies and algorithms built into the game product prays upon the chemical reward receptors of users' brains to create addictive engagement.

479.    These versions also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

480.    On certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games.  These notifications pop up on screen whether players are already playing Minecraft or not.

481.    These interactive features serve only to lure players to spend more time in the game.

482.    Once a player succeeds with one stage, they move on to the next one.  Essentially, Minecraft can last for eternity if the player is not strong-willed enough to stop playing.

483.    Minors and players with neurodivergent diagnoses, such as ADHD, can easily become hyper focused and addicted to building worlds within Minecraft.

484.    The Minecraft Defendants were aware of these propensities, and specifically developed their games along with psychologists and neuroscientists, to include addictive psychological traits.

485.    At the expense of users' mental and physical well-being, the Minecraft Defendants fail to inform the public, users, or parents about the risk of addiction and other negative consequences that can arise from gameplay.

486.    The Minecraft Defendants tout the game as educational and market it to educators for use in the classroom:

## GET MINECRAFT EDUCATION FOR YOUR CLASSROOM

Engage students in game-based learning across the curriculum. Minecraft Education is a game-based platform that inspires creative, inclusive learning through play. Explore blocky words that unlock new ways to take on any subject or challenge. **Download Minecraft Education** to get started with a free demo.

[18]

---

[18] https://education.minecraft.net/en-us

487.    The Minecraft Defendants offer teachers ready-built lessons and curriculums centered around their game:



488.    The Minecraft educational game products offered by the Minecraft Defendants to teachers and parents are built of the *Bedrock Edition* codebase and can be played on personal computers and tablets.

489.    The Minecraft Defendants do not adequately inform users of the inherent risks involved with using and playing Minecraft or that the game was designed to addict and harm users.

490.    The Minecraft Defendants are aware that the more time a user plays the game, the more likely they are to continue purchasing in-game product upgrades.

491.    The Minecraft Defendants intend to introduce and addict as many users as possible to increase their own profits as these users continue playing—and spending—as they grow.

492.    The Minecraft Defendants have profited from the release of their addictive video game product to the public.   For instance, in 2021, the Minecraft video game generated approximately $380 million across all different gaming platforms.

---

[19] https://education.minecraft.net/en-us

**Xbox and Xbox Network: Xbox One and Xbox X/S**

493.    Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as video games and online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

494.    Microsoft designs, develops, manufactures, produces, supplies, and sells Xbox video game consoles—and markets all Microsoft video game products—to the consumers across the world, and specifically in Georgia, and to Plaintiff.

495.    Microsoft has manufactured and released five versions of its Xbox consoles: Xbox (1st Generation), Xbox 360 (2nd Generation), Xbox One (3rd Generation), Xbox Series X (4th Generation), and Xbox Series S (4th Generation).

496.    Microsoft released the original Xbox was released in North America in 2001, and a year later launched its integrated Xbox Live product to allow players to play video games online.

497.    When it was released in 2002, Xbox Live required a subscription for use but was a wild success due to features, including but not limited to, a "buddy list" and access to popular online video games like Halo 2.

498.    Microsoft released Xbox 360 in 2005, and with that release, launched an upgraded Xbox Live product that included, *inter alia*, a limited "Free" or "Silver" tier that allows users to play online video games for free.

499.    Microsoft released upgraded and revised versions of its Xbox 360 console, the Xbox 360 S, and Xbox 360 E, which provided hardware and software updates to the product.

500.    Microsoft released Xbox One in North America in 2015.

501.    In marketing Xbox One, Microsoft emphasized the console's internet-based features, including but not limited to the ability to record and stream gameplay, and the ability to

integrate with a set-top box to watch television.

502.    Microsoft also released upgraded and revised versions of Xbox One, known as Xbox One S and Xbox One X, which provided hardware and software upgrades to the product.

503.    Microsoft released its fourth generation of Xbox consoles—Xbox Series X and Xbox Series S—in North America in 2020, with each model designed to be family playable.

504.    Both the Xbox Series X and Xbox Series S (collectively, "Xbox Series X/S") consoles are fully compatible with all Xbox One games and most hardware, backwards compatible with games playable on Xbox One from the Xbox 360 and original Xbox console.

505.    To help transition Xbox One users to the newer Xbox Series X/S consoles, Microsoft designed and introduced a Smart Delivery system—a product that provides automatic free updates to Xbox One versions of games to the Xbox Series X/S versions for most of Microsoft's first-party games and several of its third-party games.

506.    Each Xbox console provides users the ability to play video games, using a hard copy of the video game, a digital copy downloaded from Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live) and/or using Xbox Game Pass Cloud Gaming.

507.    Microsoft developed and maintains the Xbox Store— a product-platform through which users can purchase thousands of games to be stored on their console through digital download--for use with its Xbox consoles.

508.     When a user purchases and downloads a game from either store, regardless of whether that is a first-party video game or third-party video game, all design elements and downloadable content for said games is stored on the users' Xbox console and, if connected to the Internet, will receive product updates released by the game developer.

509.    Microsoft markets the Xbox Store as "safer for the whole family" to use:



510.    Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles, and includes the Xbox Store and Xbox Game Pass Cloud Gaming.

511.    Xbox Network is available as both a free and a paid subscription based product, known as Xbox Game Pass.

512.    Xbox Game Pass Core, formerly Xbox Live Gold, is a paid tiered subscription service offered by Microsoft that provides users access to online games, multiplayer abilities, and other features.

513.    Xbox Game Pass Ultimate, the highest tier of paid subscriptions at $17 per month, provides product users the same benefits as the other tiers, but also provides users access to Xbox Game Pass Cloud Gaming (hereinafter "Xbox Cloud Gaming").

514.    Xbox Cloud Gaming is Microsoft's Xbox cloud gaming service.

515.    Xbox Cloud Gaming was initially released in beta testing in November of 2019, and launched for Xbox Game Pass Ultimate subscribers on September 15, 2020.

---

[20] https://www.xbox.com/en-US/microsoft-store

516.    Xbox Cloud Gaming operates by linking the device to a remote server in the cloud.

517.    Gameplay is saved in the cloud and can be accessed and played from numerous devices at any given location.

518.    In fact, Xbox Cloud Gaming allows for gameplay from a number of devices—no longer is a console required. Games can be accessed instead from the content library of Xbox Cloud Gaming includes thousands of games spanning every game rating category:



519.    This means that anyone with an Xbox Cloud Gaming account can access and play any game on their Xbox console, computer, or mobile device.

520.    The games in the Xbox Cloud Gaming library are extensive and everchanging, which keeps players coming back to either finish a game before it disappears or check for new and exciting game options to play:

---

21 https://www.xbox.com/en-US/browse/games



521.    Once a game is downloaded to the user's Xbox console or made available on the Xbox Network, Microsoft provides video game developers and publishers a framework to initiate and process in-game purchases and microtransactions through the Xbox Store and Xbox Cloud Gaming.

522.    This framework enables game developers to sell microtransactions and/or loot boxes through Microsoft's video game products, described herein.

523.    In exchange, Microsoft keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

524.    Microsoft specifically designed its Xbox video game products to attract users to purchase games and in-game products therein—regardless of the content such games may include.

525.    Xbox Game Pass Ultimate also offers users daily, weekly, and monthly "quests" that can be completed for varying amounts of Microsoft Reward points:

---

[22] https://www.xbox.com/en-us/games?xr=shellnav

# How it works

Xbox Game Pass Ultimate and Console plan members can earn Microsoft Rewards points by playing games from the Xbox Game Pass library. Here's how to get started.

## 1.

### Browse current Quests

Check out current Quests on your Xbox console in the Xbox Game Pass section or on your Xbox Game Pass mobile app. New Quests are added every day.

## 2.

### Participate in Quests

Find the list of Quests in the Xbox Game Pass membership area on your Xbox console or on the Xbox Game Pass mobile app. You will receive an instant notification when your Quest is ready to be turned in.

## 3.

### Claim and track your points

Go to the Xbox Game Pass area on your Xbox console or on your Xbox Game Pass mobile app to claim and track your points.

## 4.

### Redeem points

Head to the Microsoft Rewards app to spend your points! Redeem points for Xbox gift cards and use for in-game content, games, devices, movies, apps accessories and more. [23]

526.    The ease of access, quest challenges, and constantly evolving game library draws players in, and keeps them coming back.

527.    Over 20 million people have played video games using Xbox Cloud Gaming.

528.    Xbox Cloud Gaming allows these users to connect with each other by including a feature to add and interact with friends, called "Xbox Social."

529.    This social media-esque feature permits users to add friends to a Friends list and then see what games your friends are playing and/or invite them to join your game:

---

[23] https://www.xbox.com/en-US/xbox-game-pass/quests



530.    The Xbox Network, including but not limited to Xbox Cloud Gaming, is designed to allow Xbox users and video game players to chat with each other individually or in groups.

531.    To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

532.    Minors and young adults are therefore encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

---

[24] https://support.xbox.com/en-US/help/friends-social-activity/share-socialize/use-xbox-game-bar-to-play-and-chat-with-friends

533.    Upon information and belief, Microsoft hires behavioral psychologists and neuroscientists to design its Xbox consoles, Xbox Network (and all products and features thereof), its video games, and marketing in the best way possible to attract users, especially minors, young adults, and neurodivergent individuals.

534.    Microsoft is aware that several of the video games available for play on the Xbox, and available for download in the Xbox Store and Xbox Cloud Streaming, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

535.    Microsoft does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon---were designed to addict and harm users.

**Nintendo Switch and Nintendo eShop**

536.    Nintendo is the manufacturer of the Nintendo Switch and Nintendo Switch Lite video gaming consoles (collectively, "the Switch" or "Nintendo's Switch").

537.    While it is a handheld device, the Switch allows users to play physical (or hard copies) of video games, the console is also designed for online gaming and online game purchases.

538.    In order for users to enable users to use all of these design features, Nintendo has designed a product platform, the "Nintendo eShop," for users to download certain games and play them on the Switch device.

539.    Fortnite is available on Switch and in eShop, along with over 11,000 other video games, are available for users to play through the Nintendo eShop.

540.    Once a game is downloaded to the Switch, Nintendo provides video game developers and publishers a framework to initiate and process in-game purchases and microtransactions through the Nintendo eShop.

541.    This framework enables game developers to sell microtransactions and/or loot boxes through the Nintendo platform. For example:



25

542.    In exchange, Nintendo keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

543.    Nintendo specifically designed this platform to attract users to purchase games and in-game products therein—regardless of the content such games may include.

544.    Nintendo also designed the Switch with a built-in web browser, which allows users (including minors) to access and play video games, such as Roblox, not available in the Nintendo eShop.

---

[25]https://www.nintendo.com/us/search/#q=minecraft&p=1&cat=gme&sort=df&f=topLevelFilters&topLevelFilters=DLC

545.    Upon information and belief, Nintendo hires behavioral psychologists and neuroscientists to design its Switch consoles, Nintendo eShop, its video games, and marketing in the best way possible to attract users, especially minors, young adults, and neurodivergent individuals.

546.    Nintendo is aware that several of the video games available for play on the Switch, and available for download in the Nintendo eShop, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

547.    Nintendo does not adequately inform users of the inherent risks involved with using its platforms or that the platforms—along with the games being played thereon—were designed to addict and harm users.

**N.  Plaintiff's Access to Defendants' Products**

548.    Defendants market their gaming products, including, Grand Theft Auto V, Call of Duty Fortnite, Rainbow Six and Overwatch and their respective subscription services and in-game transactions, to minors.

549.    Plaintiff was 10 years old when Defendants directed their marketing efforts and to whom Defendants sold their gaming products.

550.    Plaintiff—as a minor—lacked the capacity to contract, and thus Plaintiff expressly disaffirms any contract Plaintiff may have made with any of the Defendants, or that Defendants may claim Plaintiff made with them before reaching the age of majority.

551.    Plaintiff's continued use of Defendants' products is compulsive and due to addiction and in no way was an affirmation of any contract.

552.    After consumers purchase Defendants' gaming products, Defendants condition

users' access to their gaming products on accepting terms and conditions—and failure by users to accept and to continue to accept any new terms and conditions results in a loss of access to the purchased product. Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiff agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

553.    Defendants' products were designed to addict Plaintiff to the products, which proximately caused Plaintiff's mental and physical health issues; therefore, Defendants' terms and conditions and any other purported contracts are void as against public policy as an individual cannot consent to harming a minor.

## V.    TOLLING OF STATUTE OF LIMITATIONS

554.    Plaintiff realleges and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

555.     Through the exercise of reasonable diligence, Plaintiff could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiff.

556.    Due to the highly technical nature of the Defendants' products, Plaintiff was unable to independently discover that Defendants' products caused their injuries until within the last year.

557.    Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

558.    Defendants' fraudulent concealment has tolled the running of any statute of limitations.

559.    Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

560.    Defendants knowingly, affirmatively, and actively concealed from Plaintiff the risks associated with the defects of their products and that these products caused their injuries.

561.    Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

562.    Despite their knowledge of the defects and attendant safety risks, Defendants continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

563.    Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

564.    For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.   CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT
#### (Against all Defendants)

565.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

566. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

567. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

568. Each of the Defendant's respective products are marketed and advertised to minors and young adults.

569. Defendants owed a duty to all reasonably foreseeable end-users/consumers to design a safe product.

570. Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harm from those products. More specifically:

    a. The COD Defendants designed the Call of Duty games with psychologically addictive features, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds;

    b. The GTA Defendants designed the Grand Theft Auto games with psychologically addictive features, including but not limited to endless activities, exciting in-game products and prizes for players to earn, and daily objectives;

c.  The Overwatch Defendants designed the Overwatch games with psychologically addictive features and tactics to ensure players keep playing the game, including but not limited to familiar characters, varied gameplay, an inclusive multiplayer environment, and daily objectives;

d.  The Fortnite Defendants designed Fortnite to be as addictive as possible and with psychologically addictive features and tricks to ensnare game players, including but not limited to, designing the game to include a "near miss" effect, loot boxes, random rewards, bright and vibrant colors, and continual gameplay variety;

e.  The Rainbow Six Defendants designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, including but not limited to constantly changing game-play sessions and increasing difficulty to move up levels within the game;

f.  The Minecraft Defendants designed Minecraft to include addictive psychological traits, including but not limited to a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects, and for Minecraft to be used with gaming consoles such as the Xbox One and Xbox X/S used by Plaintiff;

g.  Microsoft designed its Xbox One and Xbox X/S with addictive features and for use with addictive video game products, and designed its Xbox Network, including free Xbox Game Pass used by Plaintiff, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, to take advantage of the chemical reward system of users'

brains, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users; and

h. Nintendo designed the Switch with addictive features to take advantage of the chemical reward system in users' brains users, and designed the Nintendo eShop as a platform to house addictive gaming products and to purchase addictive materials for play on the Switch.

571.   The defects in the design of each of the Defendant's respective products existed prior to the release of these products to Plaintiff and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to Plaintiff via download or URL access (in regard to digital game copies and cloud gaming).

572.   Plaintiff used these products as intended, and each Defendant knew or, by the exercise of reasonable care, should have known that Plaintiff would use these products without Plaintiff inspecting them for their addictive nature.

573.   Each Defendant designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

a. The COD Defendants designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

b.  The GTA Defendants designed Grand Theft Auto in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

c.  The Overwatch Defendants designed the Overwatch games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d.  The Fortnite Defendants designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

e.  The Rainbow Six Defendants designed the Rainbow Six games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

f.  The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists to ensure the addiction of minors and neurodivergent users;

g.  Microsoft designed Xbox Plaintiff's Xbox One and Xbox X/S and the Xbox Network, including Xbox Game Pass, in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young adult users continually purchase addictive video game products for play on Xbox consoles; and

h.  Nintendo designed the Switch and Nintendo eShop in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive products for play on the Switch.

574.    Each of the Defendant's respective products are defective in design and unreasonably dangerous for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

575.    Youth and young adults, including Plaintiff, are among the ordinary consumers of each of the Defendant's products.

576.    Minors and young consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

577.    Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent risk of danger; specifically, a risk of brain damage, abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

578.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including Plaintiff who used the products

without any substantial change in the products' condition.

579.    The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

580.    Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

      a.  Choosing not to use "addictive" patents identified herein in the game design;

      b.  Redesigning gaming software to limit rather than promote addictive engagement;

      c.  Implementing robust age verification;

      d.  Implementing effective parental controls;

      e.  Implementing effective parental notifications;

      f.  Warning of health effects of use and extended use upon sign-up or log-in;

      g.  Implementing default protective limits to the length and frequency of gaming sessions;

      h.  Implementing opt-in restrictions to the length and frequency of gaming sessions;

      i.  Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

      j.  Implementing blocks to use during certain times of day (such as during school hours or late at night);

      k.  Implementing limits on number of games playable per day;

      l.  Implementing limits on the strategic timing and clustering of offers and/or

assignments and challenges to keep players engaged and playing longer;

m. Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

n. Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o. Others as set forth herein.

581. Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

582. Plaintiff used Defendants' products as intended or in reasonably foreseeable ways.

583. As a direct and proximate result of their use of Defendants' defectively designed products, Plaintiff sustained physical and mental injuries, emotional distress, pain and suffering, mental anguish, and economic injuries and damages.

584. Plaintiff's injuries and damages were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion, and distribution, especially considering each of the Defendant's conduct—described herein—of specifically designing their respect products to be addictive.

585. The defective design of the products used by Plaintiff was a substantial factor in causing harm to Plaintiff.

586. As a direct and proximate result of Defendants' respective products' defective design, Plaintiff sustained brain damage, became addicted to video games, loss of cognitive

function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain and suffering, and mental anguish.

587.    Plaintiff was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and Plaintiff suffered economic damages as a result thereof.

588.    The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to Plaintiff.

589.    Plaintiff's damages proximately caused by Defendants' defective design are Plaintiff's physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; Plaintiff's inability to attend school; economic loss related to expenses incurred because of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to Plaintiff's physical and mental injuries. Plaintiff's injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

590.    Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

591.    The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

592.    The nature of the intentional and fraudulent acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, Plaintiff continues to use Defendants' respective products. While Plaintiff uses Defendants' respective

products, Plaintiff will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

593.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN
### (Against All Defendants)

594.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

595.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

596.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

597.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

598.    Defendants owed a duty to all reasonably foreseeable end-users/consumers to disclose the known risks associated with the use of their products.

599.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

600.    Each of the Defendants sold and distributed its respective products to Plaintiff in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

601.    Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

602.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution and their respective propensities for abuse, addiction, and compulsive use by youth which can lead to a cascade of harms.

603.    Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

    a.   Defendants' respective products cause addiction, compulsive use, and/or other

simultaneous physical and mental injuries;

b.  Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

c.  The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming content to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

d.  New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e.  The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f.  The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

604.  Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

605.  Had Plaintiff received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiff would have heeded the warnings and/or

instructions.

606.   Each Defendant's failure to adequately warn Plaintiff about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

607.   As a direct and proximate result of each Defendant's failure to warn, Plaintiff has required and will require more healthcare and services and did incur medical, health, related expenses incidental to Plaintiff's addiction and mental disability, as described herein.

608.   Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

609.   The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

610.   The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, Plaintiff continues to use Defendants' respective products. When Plaintiff uses Defendants' respective products, Plaintiff will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

611.   The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Plaintiff and warrants an

award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## STRICT LIABILITY – FAILURE TO INSTRUCT
### (Pleaded in the Alternative)
### (Against All Defendants)

612.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

613.    Plaintiff pleads this claim in the alternative.

614.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

615.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

616.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

617.     Defendants owed a duty to all reasonably foreseeable end-users/consumers to provide adequate instructions on how to use their products safely and without resulting harm.

618.    Each of the Defendants sold and distributed its respective products to Plaintiff in a defective and unreasonably dangerous condition by failing to provide reasonable and adequate instructions with respect to the conditions and methods of the product's safe use when a risk of abuse, addiction, and compulsive use by youth was reasonably foreseeable in its use, unless the

danger is known to the user or is reasonably discoverable by them.

619.    Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

620.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

    a.  The COD Defendants designed the Call of Duty games to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    b.  The GTA Defendants defectively designed Grand Theft Auto to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c.  The Overwatch Defendants designed the Overwatch games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal

symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.  The Fortnite Defendants designed Fortnite with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  The Rainbow Six Defendants designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  The Minecraft Defendants designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.   Microsoft designed its Xbox One and Xbox X/S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

h.   Nintendo designed the Switch and Nintendo eShop as platforms to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

621.   Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

622.   Each of the Defendants knew, or by the exercise of reasonable care, should have

known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

623.    Defendants' products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to instruct users with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harms built into each Defendant's respective products.

624.    Ordinary users would not have recognized the potential risks of Defendants' products when used in a manner reasonably foreseeable to each of the Defendants.

625.    A reasonable company under the same or similar circumstances as each of the Defendants would have used provided adequate instructions to consumers, including Plaintiff.

626.    At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

627.    Had Plaintiff received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiff would have followed such instructions.

628.    Each Defendant's failure to adequately instruct Plaintiff regarding the risks of each of the Defendant's respective products and the need to alter Plaintiff's game play to avoid such risks was a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

629.    As a direct and proximate result of each Defendant's failure to instruct, Plaintiff has required and will require more healthcare and services and did incur medical, health,

incidental, and related expenses, as described herein.

630.   Defendants are strictly liable due to each Defendant's failure to instruct regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, as described herein, and Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

631.   The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

632.   The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conduct in making their games addictive, Plaintiff continues to use Defendants' respective products. When Plaintiff uses Defendants' respective products, Plaintiff will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

633.   The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Plaintiff and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT IV
## NEGLIGENCE – DESIGN
### (Against All Defendants)

634.   Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

635.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

636.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

637.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

638.    Defendants owed a duty to all reasonably foreseeable end-users/consumers to design a safe product.

639.    Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner. More specifically:

> a. The COD Defendants designed the Call of Duty games to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.   The GTA Defendants designed Grand Theft Auto to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.   The Overwatch Defendants designed the Overwatch games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.   The Fortnite Defendants designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.   The Rainbow Six Defendants designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal

symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  The Minecraft Defendants designed Minecraft with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.  Microsoft designed its Xbox One and Xbox X/S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

h.  Nintendo designed the Switch with addictive features and with the intent that users use the Switch console to play addictive video games, and designed the Nintendo eShop as a platform to house addictive gaming products and pushed

users to purchase products in the Nintendo eShop for use and play on the
Switch, while knowing that extended play, abuse, and compulsive use by
minors and neurodivergent people can lead to addiction, brain damage, and
injury, including but not limited to dissociative behavior, withdrawal
symptoms, social isolation, negative consequences on cognitive processes, and
other harmful effects.

640.   Each Defendant knew or, by the exercise of reasonable care, should have known
that its respective products posed risks of harm to youth. These risks were known and knowable
in light of each of the Defendant's own internal information and knowledge regarding its products
at the time of the products' development, design, marketing, promotion, advertising, and
distribution to Plaintiff especially considering each of the Defendant's conduct—described
herein—of specifically designing their respective products to be addictive.

641.   Each of the Defendants knew, or by the exercise of reasonable care, should have
known, that ordinary consumers such as Plaintiff would not have realized the potential risks and
dangers of the Defendants' respective products. Those risks include abuse, addiction, and
compulsive use in youth which can lead to a cascade of negative effects including but not limited
to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on
cognitive processes, and other harmful effects. Despite this knowledge, each Defendant failed to
warn users, including Plaintiff of their respective product's dangerous propensity.

642.   Each Defendant knew that minors such as Plaintiff would use its respective
products.

643.   Plaintiff was a foreseeable user of each of the Defendant's respective products.

644.   Each Defendant had a non-delegable duty to design reasonably safe products.

645. Each Defendant owed this duty to users including Plaintiff

646. Each Defendant breached this duty. These breaches include, but are not limited to:

a. Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

b. Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

c. Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

d. Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

f. Otherwise failing to use ordinary care in its design.

647. Alternative designs that would reduce the addictive features of each of the Defendant's respective products were available, would have effectively served the same purpose

as each of the Defendant's defectively designed products, and would have reduced the gravity and severity of danger each of the Defendant's respective products posed minors such as Plaintiff.

648.    A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

649.    At all relevant times, Plaintiff used each of the Defendant's respective products in the way they were intended by Defendants to be used.

650.    As a direct and proximate result of each of the Defendant's breached duties, Plaintiff was harmed.

651.    Defendants' design of their respective products was a substantial factor in causing the Plaintiff's harm and injuries, as described herein.

652.    As a direct and proximate result of each of the Defendant's breached duties, Plaintiff has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses related to the Plaintiff's gaming addiction, physical injuries, mental health diagnoses, emotional distress, pain, suffering, and mental anguish proximately caused by the negligent design of each Defendant's product.

653.    As a direct and proximate result of each of the Defendant's breached duties, Plaintiff has suffered—and continued to suffer—economic loss and pecuniary damages, as described herein, related to the Plaintiff's gaming addiction, mental health diagnoses, emotional distress, pain, suffering, and mental anguish proximately caused by the negligent design of each Defendant's product.

654.    Defendants negligently designed their respective gaming products, as identified herein, and Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT V
## NEGLIGENCE – FAILURE TO WARN
### (Against All Defendants)

655.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

656.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

657.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

658.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

659.    Defendants owed a duty to all reasonably foreseeable end-users/consumers to disclose the known risks associated with the use of their products.

660.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner. More specifically:

   a.   The COD Defendants designed the Call of Duty games to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury,

including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. The GTA Defendants designed Grand Theft Auto to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. The Overwatch Defendants designed the Overwatch games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. The Fortnite Defendants designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain in order to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. The Rainbow Six Defendants designed the Rainbow Six games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can

lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  The Minecraft Defendants designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.  Microsoft designed its Xbox One and Xbox X/S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases through the product, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

h.  Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and used algorithms and other

psychological tactics to push users to make purchases on the Nintendo eShop, while knowing that extended play, abuse, and compulsive use by minors and neurodivergent people can lead to addiction, brain damage, and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

661.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff especially considering each of the Defendant's conduct—described herein—of specifically designing their respective products to be addictive.

662.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

663.    Each Defendant knew that minors such as Plaintiff would use its respective products.

664.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

665.    Had Plaintiff received proper or adequate warnings about the risks of Defendants' products, Plaintiff would have heeded such warnings.

666.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

667.    Each Defendant owed this duty to users including Plaintiff.

668.    Each Defendant breached this duty owed to Plaintiff a foreseeable user. These breaches include, but are not limited to:

      a.  Failing to warn users that Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries; and

      b.  Failing to otherwise provide reasonable and adequate warnings to Plaintiff, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product.

669.    A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

670.    At all relevant times, each Defendant could have provided adequate warnings to prevent the harm and injuries described herein.

671.    Had Plaintiff received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiff. would have heeded such warnings.

672.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

673.    Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiff.

674.    Each Defendant negligently failed to warn consumers, including Plaintiff, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VI
## NEGLIGENCE – FAILURE TO INSTRUCT
### (Against All Defendants)
### (Pleaded in the Alternative)

675.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

676.    Plaintiff pleads this Count in the alternative.

677.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff.: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

678.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

679.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

680.    Defendants owed a duty to all reasonably foreseeable end-users/consumers to provide adequate instructions on how to use their products safely and without resulting harm.

681.   Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

a.   The COD Defendants designed the Call of Duty games with addictive features to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.   The GTA Defendants designed Grand Theft Auto with addictive features to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.   The Overwatch Defendants designed the Overwatch games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. The Fortnite Defendants designed Fortnite to take advantage of the chemical reward system of a product user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. The Rainbow Six Defendants designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. The Minecraft Defendants designed Minecraft to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g. Microsoft designed its Xbox One and Xbox X/S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by Plaintiff., i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, with addictive features to be used with its Xbox consoles and as a product to house and to

purchase addictive video game products, and Microsoft targeted users to make purchases through the product, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

h.   Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

682.   Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

683.   Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

684.    Each Defendant had a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use unless the danger is known to the user or is reasonably discoverable by them.

685.    Each Defendant breached its duty by failing to provide reasonable and adequate instructions to Plaintiff a foreseeable user. More specifically, Defendants did not give any instructions with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harms built into each Defendants' respective gaming products.

686.    A reasonable company under the same or similar circumstances as Defendants would have used provided adequate instructions to consumers, like Plaintiff.

687.    At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

688.    Had Plaintiff received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiff would have followed such instructions.

689.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate instructions, Plaintiff was harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient instructions was a substantial factor in causing harm to Plaintiff.

690.    As a direct and proximate result of each Defendant's failure to instruct, Plaintiff has required—and will require more—healthcare and services, along with incurring—and continuing to incur—medical, health, incidental, and related expenses.

691.    Plaintiff has also incurred economic losses, including thousands of dollars spent by Plaintiff while using Defendants' products, that they would not have incurred but for the addictive

and harmful propensities of Defendants' gaming products.

692.    Each Defendant negligently failed to instruct consumers, including Plaintiff, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VII
## NEGLIGENCE PER SE
### (Against All Defendants)

693.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

694.    The United States Congress has enacted the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, to protect minors who use the Internet.

695.    Federal regulations, specifically 16 C.F.R. § 312 *et seq.*, have been put in place to effectuate COPPA's purposes and which establish certain obligations for operators of websites and online services that are intended to inform parents and guardians about the collection of their children's personal information.

696.    COPPA requires operators of online services and websites directed to children under 13 to notify parents about the personal information they collect and to obtain verifiable parental consent before collecting and using any personal information collected from children. 16 C.F.R. § 312.4(a).

697.    The parental notice required by COPPA "must be clearly and understandably written, complete, and must contain no unrelated, confusing, or contradictory materials." 16 C.F.R. § 312.4(a).

698.    COPPA requires operators to make reasonable efforts to ensure that a parent of a

child receives direct notice of the operator's practices with regard to the collection, use, or disclosure of personal information from children before collecting personal information from children. 16 C.F.R. § 312.4(b).

699.    COPPA requires operators of online services and websites to collect a child's telephone number, as opposed to online contact information, without first obtaining verifiable parental consent. 16 C.F.R. § 312.5(c)(1) and (6).

700.    COPPA requires operators to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that each Defendant collects personal information from children. 16 C.F.R. § 312.4(d).

701.    A violation of COPPA, including the regulations enacted to enforce that law, constitutes an unfair or deceptive act or practice in or affecting commerce. *See* 15 U.S.C. § 6502(c); 15 U.S.C. § 45(a)(1).

702.    Avatars generated from a child's image, and biometric and health information, are covered by COPPA when collected with other personal data.

703.    Each Defendant is an "operator" as defined by 16 C.F.R. § 312.2 and, therefore, subject to the laws and regulations established by COPPA.

704.    Each of the Defendants collects or uses personal information from children under the age of 13—including Plaintiff—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

705.    Each Defendant has actual knowledge that it collects personal information directly from users of its respective websites or online services.

706.    Each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

a. Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

b. Failing to make reasonable efforts, taking into account available technology, to ensure parents received such notice on their websites and applications so that parents could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

c. Failing to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

d. Deploying design tricks, known as dark patterns, to dupe millions of players (including minors like Plaintiff into making unintentional purchases;

e. Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

f. Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

707. The Minecraft Defendants, in connection with Minecraft, violated COPPA and those violations include, but are not limited to:

a. Collecting and maintaining personal information from minors without parental consent. For example, when learned that certain users were children after they provided their birthdates in the first step of the account creation process but

went on to request phone numbers from the children, before seeking to involve a parent;

b.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

c.  Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

    i.  Collecting personal information, from the child in violation of COPPA and then suggesting that the child seek parental involvement—this limited notice of the Minecraft Defendants information practices failed to ensure parents received adequate notice about the Minecraft Defendants' collection, use, and disclosure practices concerning children's personal information;

    ii.  Failing to include the information required by 16 C.F.R. § 312.4(b);

    iii.  Failing in the direct notice to describe the Minecraft Defendants' collection and use practices regarding personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement"); and

    iv.  Not disclosing in the direct notice to parents that the Minecraft Defendants intended to collect such personal information as images that could contain a child's likeness;

d.  Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that the Minecraft Defendants collect personal information from children;

e.  Failing to include a complete Privacy Statement was incomplete. More specifically, until at least 2019, the Minecraft Defendants' Privacy Statement contained a section entitled "Collection of data from children"; however, this section did not describe what personal information was collected from children or the Minecraft Defendants' use and disclosure practices for personal information collected from children as required---and instead the section discussed Microsoft's information practices regarding Microsoft products and children generically.

708.  Microsoft, in connection with its Xbox game consoles and Xbox Network, including but not limited to its Xbox One and Xbox X/S and Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, violated COPPA and those violations include, but are not limited to:

a.  Collecting personal information from children who signed up to its Xbox gaming system without notifying their parents or obtaining their parents' consent, and by illegally retaining children's personal information;

b.  Allowing children, after creating an account on Xbox, to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user, which Microsoft then combines with a unique persistent identifier it creates for each account holder, even children, to share with third-party game and app developers;

c.  Allowing—by default—all users, including children to play third-party games and apps while using Xbox Game Pass, requiring parents to take additional steps to opt out if they do not want their children to access them; and

d. Using the data collected on minor children less than 13 years old to use a patented system of analyzing gamer behavior, tracking kids with their respective gamer tag, and used a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or internet gaming disorder.

709. Microsoft's COPPA violations harmed and damaged Plaintiff because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors—including Plaintiff.—and to design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

710. Nintendo, in connection with the Switch and the Nintendo eShop, violated COPPA and those violations include, but are not limited to:

a. Failing to notify parents that children had open access to in-game purchases;

b. Collecting personal data from children, including account information, content interaction, purchase information, location information, and health information, despite being aware that numerous children were playing games through Nintendo Switch;

c. Requiring parents who requested that their children's personal information be deleted to complete a number of steps to make such request; and

d. Requiring users or parents to take additional steps to opt out if they do not want unnecessary data collected;

e. Sharing personal information of children with third parties, including service providers, game publishers, and Nintendo business partners, and failing to regulate how those third parties utilize the personal information;

f.   Utilizing third parties to collect personal information and activity from minors without parental consent;

g.   Using dark patterns to entice minors, including D.G., into microtransactions without parental consent or consent of the account holder, including but not limited to attracting and enticing minors into microtransactions based on the minor-player's gaming behavior and their personal data (e.g., IP addresses, geolocation, voice) that is illegally collected, not deleted, or gained through passive tracking applications; and

h.   Collecting and retaining children's voice and audio information.

711.   Nintendo's COPPA violations harmed and damaged Plaintiff because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

712.   The GTA Defendants, in connection with Grand Theft Auto, violated COPPA and those violations include, but are not limited to:

a.   Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, web and app browsing activity, device usage, profile inferences, and precise location;

b.   Collecting and maintaining biometric material, including photographs, audio recordings, and video footage;

c.   Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

d.   Collecting minors' information from third-party accounts;

e.  Automatically collecting minors' information through tracking technologies;

f.  Sharing minors' information with third parties and business partners; and

g.  Failing to provide through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to users'—including minors'—personal information.

713.  The GTA Defendants' COPPA violations harmed and damaged Plaintiff because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

714.  The COD Defendants and Microsoft, in connection with the Call of Duty game series, violated COPPA and those violations include, but are not limited to:

a.  Collecting and maintaining personal information from minors without parental consent;

b.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

c.  Retaining personal information obtained from minors without notifying parents or obtaining parental consent;

d.  Using the data wrongfully collected from minors, specifically children aged 13 or below, to analyze gamer behavior;

e.  Tracking minors under the age of 13 through their respective gamer tags, and then using deceptive marketing strategies and patented technologies to ensure

minors remained engaged in the games, including but not limited to allowing minors to engage in microtransactions and purchase in-game products without parental consent;

f.  Allowing children, after creating an account, to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user. Defendants then combine this information with a unique persistent identifier created for each account holder, even children, and share this information with third parties;

g.  Allowing children to download the Call of Duty app and create a Call of Duty app account without parental consent, thereby allowing other known and unknown players to see when minors are online;

h.  Utilizing the Call of Duty app and built-in features to track minors' game play and analyze their game movement in order to create a heatmap, then using the wrongfully collected data to make in-game purchase recommendations, to encourage weekly game objectives, and to connect other known and unknown players to minors;

i.  Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

    i.  Collecting personal information, from the child in violation of COPPA, and then suggesting that parents concerned with the collection of their children's information should contact them via their website;

      ii.  Collected and released information about minors to third parties, as well as third party vendors, agents, employees, developers, agents and/or representatives without parental consent;

     iii.  Failing to include the information required by 16 C.F.R. § 312.4(b);

     iv.  Failing in the direct notice to describe Defendants' collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement") while concealing the collection of data obtained on minors by third-party vendors and/or other game integrations; and

j.  Not disclosing in the direct notice to parents that Defendants intended to collect such personal information as images that could contain a child's likeness;

k.  Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Defendants collect personal information from children; and

l.  Failing to include a required disclosure in Defendants' Privacy Statement(s) explaining what personal information was collected from children or explaining Defendants' use and disclosure practices for personal information collected from children as required—and instead generically discussing information practices regarding Defendants' products and children using vague and ambiguous language.

715.    The COD Defendants and Microsoft's COPPA violations harmed and damaged Plaintiff because, *inter alia*, these privacy violations were used to analyze the gaming and

purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

716.    The Fortnite Defendants, in connection with its Fortnite video games product, violated COPPA and those violations include, but are not limited to:

a.    Deploying design tricks, known as dark patterns, to dupe millions of players (including minors like Plaintiff into making unintentional purchases in its Fortnite game;

b.    Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

c.    Collecting personal data from children, including Plaintiff, without first obtaining parents' verifiable consent despite being aware that many children were playing Fortnite;

d.    Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

e.    Utilizing default settings that enable live on-by-default text and voice communications for users and these default settings harm children and teens— and violate COPPA because these default settings, along with Epic Games's role in matching children and teens with strangers to play Fortnite together, harmed children and teens, exposing children and teens to bullying, threats, harassment, and other dangerous and psychologically traumatizing issues such as suicide while on Fortnite;

f.  Tricking users, including minors like Plaintiff, into making purchases while playing Fortnite. More specifically, Epic Games has deployed a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases. Fortnite's counterintuitive, inconsistent, and confusing button configuration led players to incur unwanted charges based on the press of a single button. For example, players could be charged while attempting to wake the game from sleep mode, while the game was in a loading screen, or by pressing an adjacent button while attempting simply to preview an item. These tactics led to hundreds of millions of dollars in unauthorized charges for consumers;

g.  Charging account holders, including Plaintiff, without authorization and allowed minors, including Plaintiff, to purchase in-game content without parental consent;

h.  Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the content they have purchased, which can total thousands of dollars and, even when Epic Games agreed to unlock an account, consumers were warned that they could be banned for life if they disputed any future charges; and

i.  Purposefully obscuring cancel and refund features to make them more difficult to find.

717.  The Fortnite Defendants' COPPA violations harmed and damaged Plaintiff because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into

buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

718.    The Overwatch Defendants, in connection with Overwatch, violated COPPA and those violations include, but are not limited to:

    a.  Collecting and maintaining personal information from minors without parental consent;

    b.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

    c.  Retaining personal information obtained from minors without notifying parents or obtaining parental consent;

    d.  Using the data wrongfully collected from minors, specifically children age 13 or below, to analyze gamer behavior;

    e.  Tracking minors under the age of 13 through their respective gamer tags, and then using deceptive marketing strategies and patented technologies to ensure minors remained engaged in the games, including but not limited to allowing minors to engage in microtransactions and purchase in-game products without parental consent;

    f.  Allowing children, after creating an account, to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user. Defendants then combine this information with a unique persistent identifier created for each account holder, even children, and share this information with third parties;

g. Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

    v. Collecting personal information, from the child in violation of COPPA, and then suggesting that parents concerned with the collection of their children's information should contact them via their website;

    vi. Collected and released information about minors to third parties, as well as third party vendors, agents, employees, developers, agents and/or representatives without parental consent;

    vii. Failing to include the information required by 16 C.F.R. § 312.4(b);

    viii. Failing in the direct notice to describe Defendants' collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement") while concealing the collection of data obtained on minors by third-party vendors and/or other game integrations; and

h. Not disclosing in the direct notice to parents that Defendant intended to collect such personal information as images that could contain a child's likeness;

i. Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Defendants collect personal information from children; and

j. Failing to include a required disclosure in Defendants' Privacy Statement explaining what personal information was collected from children or explaining Defendants' use and disclosure practices for personal information collected

from children as required—and instead generically discussing information practices regarding Defendants' products and children using vague and ambiguous language.

719.    The Overwatch Defendants' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

720.    Defendants have violated statutory law, as identified above, and with each violation, each Defendant proximately caused injury and damage to Plaintiff. This damage includes the injuries and harms to Plaintiff described above, including but not limited to Plaintiff's addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's statutory violations, Plaintiff has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

721.    Plaintiff is within the class of persons that COPPA is intended to protect—and Plaintiff's injuries and damages are the type of harm that these statutes and regulations are intended to prevent—therefore, each Defendant is *per se* negligent for violating COPPA.

## COUNT VIII
## NEGLIGENCE – ORDINARY
### (Against All Defendants)

722.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

723.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

724.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

725.    Each of the Defendant's respective products are also marketed and advertised to young adults and minors, including Plaintiff.

726.    Each Defendant owed Plaintiff a duty to act as a reasonably careful company would under the circumstances.

727.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

728.    A reasonably careful company would protect Plaintiff from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

729.    A reasonably careful company would not invite, encourage, or facilitate youth,

including Plaintiff to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

730.   A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

a.   The COD Defendants and Microsoft failed to disclose that the Call of Duty games were, and are, designed with addictive features to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

b.   The GTA Defendants failed to disclose that Grand Theft Auto was designed to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, young adults, and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

c.   The Overwatch Defendants failed to disclose that they designed the Overwatch games with addictive features, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

d.   The Fortnite Defendants failed to disclose that it designed the Fortnite games with numerous psychological tricks to take advantage of the chemical reward

system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

e.   The Rainbow Six Defendants failed to disclose they designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

f.   The Minecraft Defendants failed to disclose that they designed Minecraft to include addictive features and psychological tactics to increase gameplay and product use, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage injury and, as such, the products pose significant risk of harm;

g.   Microsoft failed to disclose that it designed its Xbox One and Xbox X/Swith addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*,

minors, can lead to injury and, as such, the products pose significant risk of harm; and

h. Nintendo failed to disclose that it designed the Switch with addictive features and the Nintendo eShop as a platform to house and push addictive products to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent people, can lead to injury and, as such, the products pose significant risk of harm.

731. Plaintiff was a foreseeable user of the Defendants' respective products.

732. Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff's use of Defendants' respective products.

733. Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth, including Plaintiff in a reasonably foreseeable manner. More specifically: each Defendant should have known this because each designed their respective gaming products with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

734. At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth, including Plaintiff which risks were known and knowable, including in light of the internal information and

knowledge each Defendant had regarding its products.

735.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, including Plaintiff would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

736.    Each Defendant's conduct was closely connected to Plaintiff's injuries and damages, which were highly certain to occur.

737.    Each Defendant could have avoided Plaintiff's injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed Plaintiff.

738.    Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products, such as each of the Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.*

739.    Each Defendant also owes a duty to not to engage in unfair or deceptive acts or practices, including but not limited to utilizing deception, fraud, false pretenses, misrepresentation, or concealment in the conduct of any trade or commerce. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

740.    Each Defendant also owes a duty not to engage in deceptive trade practices in the course of business. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

741.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions

about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay to avoid such risks.

742.   Each Defendant has breached the duties owed to Plaintiff.

743.   Each Defendant has breached its duties of care owed to Plaintiff through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.   Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including Plaintiff;

b.   Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.   Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including Plaintiff;

d.   Maintaining unreasonably dangerous features and algorithms in their respective

products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff; and

e. Facilitating use of their respective products by youth under the age of 13, including Plaintiff by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

744.    Each Defendant has breached its duties of care owed to Plaintiff through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a. Failing to implement effective protocols to block users under the age of 13;

b. Failing to implement effective parental controls;

c. Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

e. Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f. Failing to implement reasonably available means to set up and operate its

products without features and patented addictive technology, discussed above,

that rely on unreasonably dangerous methods as a means to engage youth users.

745.    Each Defendant further breached the duty owed to Plaintiff by failing to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

746.    Each Defendant also breached its duty owed to Plaintiff under Georgia law not to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

747.    Each Defendant also breached its duty owed to Plaintiff under Georgia law not to engage in deceptive trade practices in the course of business. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

748.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users including Plaintiff; yet Defendants did not do this.

749.    As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiff has been injured and Plaintiff was harmed. Such injuries and harm include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

750.    Each Defendant's breach of one or more of its duties is a proximate cause of

Plaintiff's injuries and the damages sustained by Plaintiff.

751.    As a direct and proximate result of each of the Defendant's breach of duties, Plaintiff has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

752.    Each Defendant was negligent, and Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

### COUNT IX
### GROSS NEGLIGENCE
### (Against All Defendants)

753.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

754.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: Xbox One, Xbox X/S, Nintendo Switch, Minecraft, Roblox, Call of Duty Black Ops III, Call of Duty Black Ops IV, Fortnite, Grand Theft Auto V.

755.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

756.    Each of the Defendant's respective products are also marketed and advertised to young adults and minors, including Plaintiff.

757.    Each Defendant owed Plaintiff a duty to act as a reasonably careful company would under the circumstances.

758.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep

deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

759.   A reasonably careful company would protect Plaintiff from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

760.   A reasonably careful company would not invite, encourage, or facilitate youth, including Plaintiff to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did not just that.

761.   A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

    a.   The COD Defendants and Microsoft failed to disclose the Call of Duty games were, and are, designed with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to injury and, as such, the products pose significant risk of harm;

    b.   The GTA Defendants failed to disclose that it designed Grand Theft Auto with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, young adults, and neurodivergent people, can lead to injury and, as such, the products pose significant risk of harm;

    c.   The Overwatch Defendants failed to disclose that they designed the Overwatch games with addictive features, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

d. The Fortnite Defendants failed to disclose that it designed the Fortnite games with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a user's brain, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage and other injury such that the products pose significant risk of harm;

e. The Rainbow Six failed to disclose they designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

f. The Minecraft Defendants failed to disclose that they designed Minecraft with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a user's brain, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage and other injury such that the products pose significant risk of harm;

g. Microsoft failed to disclose that it designed its Xbox consoles, including Xbox One and Xbox X/S, with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take

advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, like Plaintiff can lead to injury and, as such, the products pose significant risk of harm; and

h. Nintendo failed to disclose that it designed the Switch with addictive features and the Nintendo eShop as a platform to house and used algorithms and other psychological tactics to push users to purchase addictive products, while knowing that extended play, abuse, and compulsive use of these products by foreseeable users, *i.e.*, minors and neurodivergent people, can lead to addiction, brain damage, and injury and, as such, the products pose significant risk of harm.

762. Plaintiff was a foreseeable user of each of the Defendant's respective products.

763. Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff's use of each of the Defendant's respective products.

764. Each Defendant consciously disregarded a substantial and unjustifiable risk that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth, including Plaintiff in a reasonably foreseeable manner. More specifically:

a. The COD Defendants designed the Call of Duty games to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent

individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

b.   The GTA Defendants designed Grand Theft Auto to take advantage of the chemical reward system of a user's brain (especially a minor, young adult or neurodivergent person's brain) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

c.   The Overwatch Defendants designed the Overwatch games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.   The Fortnite Defendants designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.   The Rainbow Six Defendants designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal

symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  The Minecraft Defendants designed Minecraft with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.  Microsoft designed its Xbox One and Xbox X/S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases through the product, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

h.  Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and used algorithms and other psychological tactics to push users to make purchases on the Nintendo eShop, while knowing that extended play, abuse, and compulsive use by minors and

neurodivergent people can lead to addiction, brain damage, and injury, but failed to inform the public, users, or parents, including Plaintiff, that its products pose significant risk of harm.

765.   At all relevant times, each Defendant consciously disregarded a substantial and unjustifiable risk of harm to youth, including Plaintiff which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

766.   Each Defendant consciously disregarded a substantial and unjustifiable risks Plaintiff and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

767.   Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

768.   Each Defendant's conduct was closely connected to Plaintiff's injuries and damages, which were highly certain to occur.

769.   Each Defendant could have avoided Plaintiff's injuries and damages with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed Plaintiff.

770.   Each Defendant also owes a particularly heightened duty of care to users under the

age of 13 due to the recognized safety risks posed to such users from interactive online products, such as Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.*

771.    Each Defendant also owes a duty to not to engage in unfair or deceptive acts or practices, including but not limited to utilizing deception, fraud, false pretenses, misrepresentation, or concealment in the conduct of any trade or commerce. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

772.    Each Defendant also owes a duty not to engage in deceptive trade practices in the course of business. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

773.    Each Defendant's conscious disregard of the risks associated with its products constituted a gross deviation from the standard of care a reasonable company would exercise in the situation.

774.    Accordingly, each Defendant has grossly breached its standards of care owed to Plaintiff through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those gross deviations from the standard of care include:

   a.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including Plaintiff;

   b.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff including

but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including Plaintiff;

d.  Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff; and

e.  Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

775.   Each Defendant has grossly breached its standards of care owed to Plaintiff through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those gross deviation from the standard of care include:

a.  Failing to implement effective protocols to block users under the age of 13;

b.  Failing to implement effective parental controls;

c.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.   Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

e.   Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f.   Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

776.   Each Defendant further grossly deviated from the standard of care and duty owed to Plaintiff by failing to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

777.   Each Defendant also grossly deviated from the standard of care and duty owed to Plaintiff under Georgia law not to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq*.

778.   Each Defendant also grossly deviated from the standard of care and duty owed to Plaintiff under Georgia law not to engage in deceptive trade practices in the course of business. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq*.

779.   A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users including Plaintiff; yet Defendants did not do this. This was a gross deviation and breach of duties owed to Plaintiff.

780.   As a direct and proximate result of each Defendant's gross breach of one or more of its duties, Plaintiff has been injured and Plaintiff was harmed. Such injuries and harms include

addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of family life.

781.    Each Defendant's gross deviations from the standard of care proximately caused Plaintiff's injuries and damages.

782.    As a direct and proximate result of each of the Defendant's gross deviations from the standard of care, Plaintiff has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

783.    Each Defendant was negligent, and Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT X
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

784.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

785.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

786.    As described herein, each of the Defendants designed its respective products to be

addictive to young adults and minors, including Plaintiff who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

    a. The COD Defendants designed the Call of Duty games to be as addictive as possible and to include various addictive tactics, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds, to keep users engaged with and spending money on the COD Defendants' video games;

    b. The GTA Defendants designed Grand Theft Auto to be as addictive as possible and to include various addictive tactics, including but not limited to endless activities, exciting in-game products and prizes for players to earn, and daily objectives;

    c. The Overwatch Defendants designed the Overwatch games with psychologically addictive features and tactics to ensure players keep playing the game, including but not limited to familiar characters, varied gameplay, an inclusive multiplayer environment, and daily objectives;

    d. The Fortnite Defendants designed Fortnite to be as addictive as possible, employing numerous psychological tricks, tactics, and technologies to ensnare users into extended, compulsive, abusive, and addictive use of its product, including but not limited to, designing the game to include a "near miss" effect, random rewards, bright and vibrant colors, and continual gameplay variety;

    e. The Rainbow Six Defendants designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods

of time, including but not limited to constantly changing game-play sessions and increasing difficulty to move up levels within the game;

f.  The Minecraft Defendants designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

g.  Microsoft designed its Xbox One and Xbox X/S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users; and

h.  Nintendo defectively designed the Switch with addictive features, and designed the Nintendo eShop as a platform to house addictive gaming products and used

algorithms and other psychological tactics to push users to make purchases in the Nintendo eShop.

787.   Each Defendant designed its respective products to take advantage of the chemical reward system of users' brains (especially young users, including Plaintiff to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a.   The COD Defendants designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

b.   The GTA Defendants designed Grand Theft Auto in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

c.   The Overwatch Defendants designed the Overwatch games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d.   The Fortnite Defendants designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

e.   The Rainbow Six Defendants designed the Rainbow Six games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

f.   The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

g. Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young adult users continually purchase addictive video game products for play on Xbox consoles; and

h. Nintendo designed the Switch and Nintendo eShop in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video gaming products.

788.   Defendants intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, including Plaintiff to use each Defendants' respective product and for users, including Plaintiff to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

789.   Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was extreme and outrageous, is beyond all possible bounds of decency, and utterly intolerable in a civilized community.

790.   Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was an abuse of power to affect the interests of users, including Plaintiff.

791.   Each Defendant knew that users, including Plaintiff would become addicted to Defendants' respective products because each Defendant designed and developed their respective

products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off of users, including Plaintiff after initial purchase or download.

792.   Each Defendant intended to inflict emotional distress *(e.g.*, causing addiction) on users, including Plaintiff and knew that users, including Plaintiff would suffer emotional distress as a result of Defendants' conduct.

793.   Plaintiff has sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

794.   Such conduct in intentionally creating products to addict and abuse children and cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community and Defendants knew there was a high probability the addicted minor would have gamer's rage and withdrawal symptoms which would cause emotional distress to the gamer, parents, and other household members.

795.   No reasonable person would be expected to endure such emotional distress suffered by Plaintiff as a result of each Defendant's conduct.

796.   Plaintiff was particularly susceptible to emotional distress from each Defendant's respective conduct due to Plaintiff's age and mental capabilities.

797.   As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Plaintiff has experienced extreme emotional distress, including anxiety related to Plaintiff's inability to function without out-patient counseling, and mental anguish associated with the effects of Plaintiff's gaming addiction.

798.   As a direct and proximate result of each Defendant's outrage, Plaintiff has been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that

proximately caused Plaintiff's severe emotional distress and injuries; therefore, Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

799.    Further, each Defendant's outrageous conduct, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XI
## FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

800.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

801.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

802.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

803.    Each Defendant made representations of material facts about their respective products, while knowing or believing those representations to be false *and* with the intent that Plaintiff (and the public) relies on those misrepresentations.

804.   These false representations involve misstatements about the safety of each Defendant's product identified herein and include, but are not limited to:

  a.  The COD Defendants misrepresented the Call of Duty games as safe for extended, long-term play while knowing that abuse, addiction, and compulsive use by foreseeable users like youth and neurodivergent people can lead to injury, and knowing that they had designed and developed the Call of Duty games to be as addictive as possible;

  b.  The GTA Defendants misrepresented Grand Theft Auto as safe for extended, long-term play and for use by minors, young adults, and neurodivergent individuals, including Plaintiff, while knowing that abuse, addiction, and compulsive use by such users can lead to brain damage and other injury, and knowing that it had designed and developed the Grand Theft Auto series to be as addictive as possible;

  c.  The Overwatch Defendants misrepresented the Overwatch games as safe for use by minors and young adults, including Plaintiff, while knowing that it had designed and developed the Overwatch games with addictive features and that its products pose significant risk of harm, such that Overwatch poses significant risk of harm to users, like Plaintiff;

  d.  The Fortnite Defendants misrepresented Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals, including Plaintiff, while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible;

e.  The Rainbow Six Defendants misrepresented the Rainbow Six games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Rainbow Six more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that Rainbow Six poses significant risk of harm to users, like Plaintiff;

f.  The Minecraft Defendants misrepresented the Minecraft games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Minecraft more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, such that Minecraft poses significant risk of harm to users;

g.  Microsoft misrepresented that its Xbox One, Xbox X/S, and Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, were safe for use by minors, young adults, and neurodivergent people, while knowing that it was designed and developed with addictive features to keep such users using Microsoft's video game products, playing video games, and purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury, such that Microsoft's video game products pose significant risk of harm to users, including Plaintiff; and

  h. Nintendo misrepresented that its Switch and Nintendo eShop were safe for use by minors and young adults, while knowing that they was designed and developed with addictive features to keep users purchasing addictive products, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to users, like Plaintiff.

805. Defendant knew their games posed risk to minors, including Plaintiff based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, including Plaintiff to purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

806. Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiff, into believing these products were safe or even beneficial for children to use. These misrepresentations of material fact include, but are not limited to:

  a. The COD Defendants marketed their Call of Duty games without warning of the addictive design and risk of injury associated with the products, despite knowing that the Call of Duty games contained an inherent risk of abuse, addiction, and compulsive use by foreseeable users, including minors and neurodivergent individuals, and the harms that arise therefrom, and that have been experienced by Plaintiff;

  b. The GTA Defendants marketed their Grand Theft Auto video game products as safe for use by youth and young adults and without warning of the addictive

design and risk of injury associated with the products, despite knowing that use of Grand Theft Auto contained an inherent risk of brain damage, injury, abuse, addiction, and compulsive use by foreseeable users, such as youth, young adults, and neurodivergent people—harms that arise from playing Grand Theft Auto and that have been experienced by Plaintiff;

c.  The Overwatch Defendants marketed their Overwatch games for play by youth and directed their misstatements to youth despite knowing that the Overwatch games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by Plaintiff.

d.  The Fortnite Defendants marketed Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals (in and outside the classroom), despite knowing that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by such users leading to brain damage and other damages that arise therefrom, and that have been experienced by Plaintiff;

e.  The Rainbow Six Defendants marketed Rainbow Six for play by youth and directed their misstatements at youth, despite knowing that its Rainbow Six games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by Plaintiff;

f.  The Minecraft Defendants marketed Minecraft as "educational" and for use in the classroom despite knowing that its Minecraft games contained an inherent

risk of abuse, addiction, and compulsive use by youth and the harms that arise

therefrom, and that have been experienced by Plaintiff;

g.   Microsoft knew that its Xbox One, Xbox X/S, and Xbox Online

Products/Subscriptions used by Plaintiff., i.e., Xbox Store, Xbox Game Pass

Ultimate, and Xbox Cloud Gaming, as well as Roblox, Minecraft, Call of Duty,

Fortnite and Grand Theft Auto V games contained an inherent risk of abuse,

addiction, and compulsive use by youth, young adults, and neurodivergent

people, and the harms that arise therefrom, but intentionally marketed  its

products for use by such individuals and directed its misstatements towards

users of Roblox, Minecraft, Call of Duty, Fortnite and Grand Theft Auto V, and

other games designed, developed and utilizing the patents and technology

described herein; and

h.   Nintendo knew that its Switch, Nintendo eShop platform, and the Fortnite

games played on Switch, contained an inherent risk of abuse, addiction, and

compulsive use by youth and neurodivergent individuals, and the harms that

arise therefrom, but intentionally marketed its products for use by the general

public, including minors, and directed its misstatements towards users of these

gaming products and other games designed, developed and utilizing the patents

and technology described herein.

807.   By intentionally making numerous material misrepresentation, including, but not

limited to, downplaying any potential harm associated with its respective products, and affirmative

representations to the public, users, and parents, including Plaintiff, that its products were safe,

each Defendant intended to mislead the public, users, and their parents, including Plaintiff, into

believing its products were safe for children to use.

808.    Each Defendant knew that its misstatements and false representations, as identified herein, were material.

809.    Each Defendant knew that its misstatements and false representations, as identified herein, were false.

810.    The misrepresentations described herein were made to Plaintiff—particularly to Plaintiff—prior to Plaintiff's purchase of each Defendant's product and to Plaintiff while Plaintiff was using Defendants' products as intended.

811.    Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

812.    Plaintiff's reliance on the material misrepresentations of each Defendant when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product was justifiable.

813.    As a direct and proximate result of the material misrepresentations and false statements of each Defendant, *i.e.,* Defendants' deceit, Plaintiff was not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiff justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

814.    As a direct and proximate result of each of the Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiff has been damaged. Such damage includes Plaintiff's mental harm (and the permanency thereof); pain and suffering; mental

anguish; Plaintiff's inability to function at grade level without additional supportive services; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to Plaintiff's mental harm. Further, Plaintiff's injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

815.    Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiff's injuries and losses; therefore, Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

816.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, including Plaintiff, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XII
## FRAUDULENT CONCEALMENT
### (Against All Defendants)

817.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

818.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six,

Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

819.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, particularly young adults and minors, including Plaintiff

820.    Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

    a.    The COD Defendants designed the Call of Duty games with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiff;

    b.    The GTA Defendants designed Grand Theft Auto with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by such users can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiff;

    c.    The Fortnite Defendants designed the Overwatch games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public and product users, including Plaintiff;

d.  The Fortnite Defendants designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use by such users (particularly minors and neurodivergent people) can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiff;

e.  The Rainbow Six Defendants designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public and product users, including Plaintiff;

f.  The Minecraft Defendants designed the Minecraft games with addictive psychological features to take advantage of the chemical reward system in user's brains and keep users playing more often and longer, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiff;

g.  Microsoft designed its Xbox One and Xbox X/S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by Plaintiff., i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users'

brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public, product users, and parents, including Plaintiff; and

h.   Nintendo designed the Switch and Nintendo eShop with addictive features, and the Nintendo eShop as a platform to house addictive gaming products—while knowing that abuse, addiction, and compulsive use of such products by minors and neurodivergent individuals can lead to injury—but concealed this information from the public, parents, and product users, including Plaintiff.

821.   Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings to induce youth, including Plaintiff to continue using its respective products and avoid losing users and revenue.

822.   By intentionally concealing material information, including, but not limited to, concealing the risk of abuse, addiction, and compulsive use designed in each of its respective products, each Defendant intended to mislead the public, users, and their parents, including Plaintiff, into believing its products were safe for children to use.

823.   Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

824.   Each Defendant knew the misrepresentations it made to Plaintiff regarding its products were falsehoods and made such representations regardless.

825.   Each Defendant knew the misrepresentations it made to Plaintiff were material.

826.    At the time each Defendant utilized these technologies to induce Plaintiff to make in-game purchases, each Defendant knew that the representations made through the game were false and existed only to entice Plaintiff to become addicted and continue spending.

827.    Each Defendant intended its fraudulent in-game content to induce Plaintiff to continue purchasing in-game downloadable content and/or in-game transactions within its respective product.

828.    A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

829.    If Defendants had not concealed material facts about the safety of their respective products, including but not limited to concealing that the products had been designed to be addictive, then Plaintiff would not have purchased, downloaded played, continued to use, and/or purchased downloadable game content or in-game transactions in each Defendant's product.

830.    Plaintiff reasonably and justifiably relied on the representations each Defendant's made regarding its products to make several in-game purchases.

831.    As a direct and proximate result of each Defendant's concealment of material information, Plaintiff was not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

832.    As a direct and proximate result of each Defendant's concealment of material information, Plaintiff has been injured and Plaintiff has sustained damages, as described herein.

833.    Each Defendant engaged in fraudulent misrepresentations and deceit that is a

proximate cause of Plaintiff's injuries and losses; therefore, Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

834.    Further, each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore, an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

835.    Defendants' fraudulent concealment tolls any applicable statute of limitations.

## COUNT XIII
## FRAUDULENT INDUCEMENT
### (Against All Defendants)

836.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

837.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

838.    Within these products, each Defendant included the ability for users, including Plaintiff, to purchase in-game downloadable content or microtransactions.

839.    Users of Defendants' products, including minors such as Plaintiff were induced into

microtransactions by each Defendant to make such purchases through false representations and material misstatements built into each of the Defendants' products. Defendants' methods of fraudulent inducement include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage purchase, and disguised features of the Defendants' products, which misrepresent to users, like Plaintiff, that game-selected purchases would help them advance in the game or complete necessary missions.

840.    Defendants made these false representations and material nondisclosures with intent to induce Plaintiff into the microtransaction.

841.    At the time each Defendant utilized these technologies to induce Plaintiff to make in-game purchases, each Defendant knew that the representations made through the game were false and existed only to entice Plaintiff to become addicted and continue spending.

842.    Each Defendant intended its fraudulent in-game content to induce Plaintiff to continue purchasing in-game downloadable content and/or in-game transactions within its respective product.

843.    At the same time, each Defendant knew that the inducements to make additional in-game purchases served only to increase the inherent risk of danger to users, including Plaintiff specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

844.    Plaintiff reasonably and justifiably relied on the enticements within each

Defendant's product to make several in-game purchases that had little to no value to Plaintiff within the game.

845.   Had Plaintiff known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, Plaintiff never would have agreed to purchase in-game downloadable content or microtransactions.

846.   Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, including Plaintiff.

847.   Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly concealed those findings, to avoid losing revenue, and to induce Plaintiff to continue using each Defendant's respective products.

848.   In conjunction with Defendants' acts of concealment, each Defendant knowingly and recklessly misled the public, users, and their parents, including Plaintiff, into believing these products were safe or even beneficial for children to use.

849.   Each Defendant intended its concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

850.   By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its respective products, and reassuring the public, users, and parents, including Plaintiff, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

851.   As a direct and proximate cause of each of the Defendant's deceptive and fraudulent conduct, Plaintiff is addicted to Defendants' respective products and is unable to refrain from gameplay or in-game purchases.

852.   Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, including Plaintiff would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

853.   A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Plaintiff justifiably relied on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

854.   As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiff was not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

855.   As a direct and proximate result of each of the Defendant's concealment of material information, Plaintiff has been financially and otherwise harmed through each of the Defendant's inducements to utilize their platforms, download and play their games, and/or continuously spend funds through its products.

856.   As a direct and proximate result of each Defendant's fraudulent inducement,

Plaintiff has been damaged. Specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions to parents that minors gaming behavior is collected and tracked and nondisclosure of the risk of gaming addiction, and that deceitful conduct is a proximate cause of Plaintiff's injuries and losses; therefore, Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

857.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, including Plaintiff, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

**COUNT XIV**
**NEGLIGENT MISREPRESENTATION**
**(Against All Defendants)**
**(Pleaded in the Alternative)**

858.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

859.    Plaintiff pleads this in the alternative.

860.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Plaintiff: COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch.

861.    Each Defendant---and all designers, developers, manufacturers, publishers, and

suppliers of video gaming products---had a duty to communicate accurate information and to make truthful statements of material fact to the public. This duty includes but is not limited to telling Plaintiff the truth about the addictive design and dangerous condition of Defendants' products and that those products posed serious health risks to users, particularly youth.

862.    As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its respective products pose serious health risks to users, particularly minors, including Plaintiff; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiff, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiff that its products were safe or even beneficial for children to use:

      a.  The COD Defendants misrepresented Call of Duty as safe for use by minors, young adults, and neurodivergent individuals, despite knowing that, due to the COD Defendants design and development of their products, the games contained an inherent risk of abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage and injury;

      b.  The GTA Defendants marketed and misrepresented Grand Theft Auto as safe for use by minor, young adults, and neurodivergent individuals, despite knowing that, due to the GTA Defendants design and development of their Grand Theft Auto video games, the products contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent people that can lead to brain damage and injury;

c.  The Overwatch Defendants misrepresented Overwatch as safe for use by minors and young adults, even marketing the games toward youth, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

d.  The Fortnite Defendants misrepresented Fortnite as safe for use by minors, young adults, and neurodivergent individuals, even marketing the games as "educational" and for use in classrooms, despite knowing that, due Fortnite's product design, the video game contains an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

e.  The Rainbow Six Defendants misrepresented Rainbow Six as safe for use by minors and young adults, even marketing the games toward youth, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

f.  The Minecraft Defendants misrepresented Minecraft as safe for use by minors and young adults, even marketing the games as "educational" and for use in classrooms, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals that can lead to brain damage and injury;

g.  Microsoft misrepresented its Xbox One, Xbox X/S, and Xbox Online Products/Subscriptions used by Plaintiff, i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming, as well as the [add specific games played on Xbox games, as safe for use by minors, young adults, and neurodivergent individuals, even marketing the products toward such users, despite knowing

that, due to their own design, Microsoft's video game products contain an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals that can lead to brain damage and injury; and

h. Nintendo misrepresented its Switch and Nintendo eShop platforms, as well as the Fortnite games downloaded on eShop and played by Plaintiff. using Switch, as safe for use by minors, young adults, and neurodivergent individuals, even marketing the platforms toward such individuals, despite knowing that, due to their own design, the Switch and the games played thereon (and available through the Nintendo eShop) contained an inherent risk of abuse, compulsive use, and addiction that can lead to brain damage and injury in these foreseeable users of Nintendo's products.

863.  Each Defendant made these false statements and misrepresentations with intent to induce Plaintiff (and the general public) to purchase and use their respective products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

864.  Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiff and the public.

865.  Defendants' false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiff to purchase and use Defendants' products, Plaintiff relied on Defendants' false statements and misrepresentations in conjunction with in-game purchases and Defendants' deceptive microtransaction mechanisms,

including the use of fake "friends" to induce Plaintiff into spending money.

866.    Plaintiff's reliance on Defendants' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

867.    Plaintiff has been damaged because of the false statements of each Defendant and Plaintiff's reliance on each Defendant's statements. This damage includes the injuries and harms to Plaintiff, described above, including but not limited to Plaintiff's addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's material misrepresentations, Plaintiff has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

868.    Plaintiff would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of Defendants' gaming products.

## COUNT XV
## CIVIL CONSPIRACY
### (Against All Defendants)

869.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

870.    Under OCGA § 16-14-4 (b), it is "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or directly, such enterprise through a pattern of racketeering activity.

871.    A civil conspiracy occurs when two or more persons have combined to accomplish

a purpose that is unlawful or oppressive, or to accomplish some purpose (that is not in itself unlawful, impressive, or immoral) by unlawful, oppressive, or immoral means to the injury of another. Such a conspiracy occurred here.

872.   Defendants demonstrated racketeering activity by committing at least two or more predicate offenses.

873.   Defendants conspired to make Defendants' products, specifically the products described herein, addictive to users, including Plaintiff.

874.   As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like Plaintiff, with unfair and deceptive trade practices to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by Plaintiff and other users.

875.   Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including Plaintiff addicted to Defendants' products.

876.   More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including Plaintiff with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

877.   As described herein, Nintendo knowingly conspired with and acted in concert with Epic Games to distribute, market, supply, and/or sell the Fortnite video games and all in-game downloadable products and in-game purchases contained therein through Nintendo eShop to design their video game products to be addictive and which pose an unreasonable risk of harm to

users, particularly minors, young adults, and neurodivergent individuals, and to violate the OCGA § 16-14-4 (b), to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff, to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

878.   In particularly, Nintendo and the Fortnite Defendants knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from the Fortnite games available on eShop and played on the Switch and all in-game downloadable products and in-game purchases made available through Nintendo eShop, and that addicted and harmed Plaintiff.

879.   As described herein, the GTA Defendants knowingly conspired and otherwise acted in concert with each other to design a video game product that is addictive and harmful to users, and with Xbox and Nintendo Switch Defendants to violate the OCGA § 16-14-4 (b), to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff, to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

880.   In particular, the GTA Defendants, Xbox and Nintendo Switch Defendants knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Grand Theft Auto games that addicted and harmed Plaintiff.

881.    As described herein, the COD Defendants and Microsoft knowingly conspired and otherwise acted in concert with each other to design a video game product that is addictive and harmful to users, and with Xbox Defendants to violate the OCGA § 16-14-4 (b), to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff, to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

882.    In particular, the COD Defendants, Microsoft, and Xbox Defendants knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Call of Duty games that addicted and harmed Plaintiff.

883.    As described herein, Microsoft conspired with and acted in concert with Activision, Infinity Ward, Treyarch, Take-Two, Rockstar Games, Rockstar North, Blizzard, Epic Games, Epic Games Int'l, Ubisoft, Ubisoft Montreal, and Mojang Studios to distribute, market, supply, and/or sell the COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft, Xbox One, Xbox X/S, and Nintendo Switch and played on the Xbox One and Xbox X/S video games and all in-game downloadable products and in-game purchases contained therein through the Xbox Network to design their video game products to be addictive and which pose an unreasonable risk of harm to users, particularly minors, young adults, and neurodivergent individuals, and to violate the OCGA § 16-14-4 (b) to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff, to violate Georgia's products liability and common law, and to

otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

884.    As described herein, the Rainbow Six Defendants conspired and otherwise acted in concert to violate the OCGA § 16-14-4 (b) fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the Rainbow Six game series to addict minors and young adults.

885.    In particular, the Rainbow Six Defendants knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Rainbow Six games that addicted and harmed Plaintiff.

886.    As described herein, the Overwatch Defendants knowingly conspired and otherwise acted in concert to violate the OCGA § 16-14-4 (b) fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the Overwatch game series to addict minors and young adults.

887.    In particular, the Overwatch Defendants knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Overwatch games that addicted and harmed Plaintiff.

888.    In particularly, Microsoft, the COD Defendants, the GTA Defendants, the Overwatch Defendants, the Fortnite Defendants, the Rainbow Six Defendants, and Minecraft

Defendants knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from COD Black Ops I, COD Black Ops II, COD Black Ops III, COD Black Ops IV, COD War Zone, COD Cold War, GTA 5, Overwatch 2, Fortnite, Rainbow Six, Minecraft and all in-game downloadable products and in-game purchases made available through the Xbox Network, and that addicted and harmed Plaintiff.

889.    In particularly, Microsoft and the Fortnite Defendants knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from consumers purchase and use of Fortnite games on the PlayStation 4 console and/or network and played by Plaintiff and all in-game downloadable products and in-game purchases made available through the PlayStation Network, and that addicted and harmed Plaintiff.

890.    As described herein, the Fortnite Defendants knowingly conspired and otherwise acted in concert with Microsoft, Nintendo, and Grand Theft Auto V Defendants to violate the Georgia OCGA § 16-14-4 (b), to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff, to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

891.    Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including Plaintiff while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

892.    Each Defendant shared a common purpose of fraudulently concealing the

unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including Plaintiff.

893.    These conspiracies allowed Defendants to maximize profits, all while causing significant harm to users.

894.    Plaintiff sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

895.    Plaintiff's injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

896.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conspiring to make their games addicting, Plaintiff continues to suffer injuries and is unable to stop using Defendants' respective products as a result of their addiction, Defendants' defective design and Defendants' failure to warn consumers, including Plaintiff about the addictive qualities and components of those products.

## COUNT XVI
## IN-CONCERT LIABILITY
### (Against All Defendants)

897.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

898.    In-concert liability arises where one party acts together with another party who commits a tort. The party acting in concert with the tortfeasor becomes liable for the tortfeasor's conduct as if there was a joint enterprise or mutual agency.

899.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like Plaintiff with unfair and deceptive trade practices to

maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by Plaintiff and other users.

900.   Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like Plaintiff, addicted to Defendants' products.

901.   More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like Plaintiff with unfair and deceptive trade practices to maximize profits off the addictive nature of the products.

902.   Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

903.   Each Defendant knew of the risk of abuse, addiction, and compulsive use by youth, including Plaintiff arising from the harmful content contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other Defendants to do the same.

904.   Each Defendant thus assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

905.   Such concerted conduct allowed Defendants to maximize profits, all while causing significant harm to users, including Plaintiff.

906.   Plaintiff sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

907.    Plaintiff's injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

908.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products.

909.    As a proximate result of Defendants' concerted actions and conspiring to make their games addicting, Plaintiff continues to suffer injuries and is unable to stop using Defendants' respective products as a result of Plaintiff's addiction, Defendants' defective design and Defendants' failure to warn consumers, including Plaintiff, about the addictive qualities and components of those products.

## VII.    <u>PRAYER FOR RELIEF</u>

910.    Plaintiff respectfully requests judgment in his favor and against each of the Defendants to the full extent of the law, as follows:

    a.  For an award of compensatory damages for Plaintiff in an amount to be determined at trial on the following elements of damage:

        i.   The nature, extent, duration, and permanency of Plaintiff's injuries;

        ii.  The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

        iii. The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future in accordance with the Family Expense Act;

       iv.  The loss of a normal life;

       v.  The pain, suffering, and mental anguish experienced in the past;

     vi.  The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

   vii.  The present value of any loss of ability to earn in the future;

  viii.  The reasonable expense of any necessary help in Plaintiff's home or school which has been required as a result of Plaintiff's injuries; and

    ix.  The present value of any necessary help in Plaintiff's home or school reasonably certain to be required in the future;

     x.  Actual financial loss;

b. For an award of actual damages for Plaintiff, including economic and pecuniary loss, in an amount to be determined at trial;

c. For injunctive relief;

d. For an award of punitive damages for Plaintiff in an amount to be proven at trial;

e. For an award of fees, costs, and attorneys' fees, as allowable by law;

f. For pre-judgment and post-judgment interest, as allowable by law; and

g. For such other and further relief as this Court may deem just and proper.

## VIII.  <u>JURY DEMAND</u>

911.   Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted, this 8th day of May, 2024.

### BULLOCK WARD MASON, LLC

/s/ *Tina M. Bullock*

Tina M. Bullock, Esq (GA Bar No 121791)
3350 Riverwood Pkwy, Suite 1900
Atlanta, Georgia 30339
(833) 296-5291
(833) 895-2022 (facsimile)
tina@bwmlaw.com

Richard Meadow, Esq.*
**THE MEADOW LAW FIRM, LLC**
2390 E. Camelback Road, Unit 403
Phoenix, Arizona 85016
(480) 269-0338
rmeadow@meadowlawfirm.com

Mark A. DiCello*
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
mad@dicellolevitt.com

*Attorneys for Plaintiff Michael Antonetti*


\* *Motion for Admission to Appear Pro Hac Vice to be filed*