IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL ANTONETTI,

    Plaintiff,

       v.

ACTIVISION BLIZZARD, INC., et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:24-CV-2019-TWT

**OPINION AND ORDER**

This is a products liability action. It is before the Court on Defendant Epic Games, Inc.'s Motion to Compel Arbitration [Doc. 46], Defendant Activision Blizzard, Inc., Infinity Ward, Inc., and Treyarch Corporation's Motion to Compel Arbitration [Doc. 59][1], and the Motion to Dismiss by all Defendants [Doc. 104]. For the reasons set forth below, the Defendant Epic Games, Inc.'s Motion to Compel Arbitration [Doc. 46] is GRANTED, the Defendant Activision Blizzard, Inc., Infinity Ward, Inc., and Treyarch Corporation's Motion to Compel Arbitration [Doc. 59] is also GRANTED, and the Defendants' Motion to Dismiss [Doc. 104] is therefore DENIED without prejudice.

## I.  Background[2]

---

[1] Defendants Activision Publishing, Inc. and Sledgehammer Games, Inc. moved to join this Motion to Compel Arbitration, and the Court granted the joinder. [Dkt Entry dated Sept. 20, 2024.]

[2] After the Defendants filed their Motions to Compel Arbitration, Antonetti filed an Amended Complaint. As the Court is referencing the Complaint only for factual background, it refers to the original Complaint, since that is the version on which the present Motions are based.

This case arises from the Plaintiff Michael Antonetti's long-term use of several popular video game titles, including Call of Duty and Fortnite. (Compl. ¶ 23). [3] Antonetti essentially alleges that the Defendant Epic Games, Inc. ("Epic") and Defendants Activision Blizzard, Inc., Infinity Ward, Inc., and Treyarch Corporation, Activision Publishing, Inc., and Sledgehammer Games, Inc. (collectively, the "Activision Defendants") produced these video games, among others, which they "had specifically developed and designed to cause [] addiction." (*Id.* ¶ 7). He alleges that the Defendants did so "by encouraging long-term, extended game play despite knowledge that such extended play causes physical harm to the human brain—and particularly to a minor's developing brain. (*Id.* ¶ 11). He further alleges that, as a result of his video gaming addiction, he suffers from: "brain damage, trouble focusing and being off task during school hours, acting disrespectfully, lying to parents and/or teachers, gamers rage, dropping grades, severe emotional distress, diminished social interactions, loss of friends, and withdrawal symptoms such as rage, anger, and physical outbursts." (*Id.* ¶ 21).

Antonetti claims that the Defendants are liable for their actions under various state and federal laws, as outlined in the eleven Counts he asserts in the Amended

---

[3] Antonetti originally asserted claims directed at Defendant Blizzard Entertainment, Inc. regarding its video game, Overwatch 2. (*See, e.g.*, Compl. ¶¶ 23, 351-73). Blizzard Entertainment, Inc. joined in the Motion to Compel [Doc. 59] filed by Activision Blizzard, Inc., Infinity Ward, Inc., and Treyarch Corporation, but was voluntarily dismissed from this action on September 1, 2024. [Dkt Entry dated Sept. 1, 2024]. Therefore, the Court need not address the arguments presented in the Motion pertaining to Blizzard Entertainment, Inc. and/or Overwatch 2.

Complaint. (Am. Compl. ¶¶ 438-701). Epic and the Activision Defendants each assert, though separately, that Antonetti's claims are subject to mandatory arbitration based on their Terms of Use ("TOU") and "End-User License Agreement[s]" ("EULA"), which they allege Antonetti agreed to before playing their video games. (Epic's Mot. to Compel, [Doc. 46], at 3-4; Activision Defs.' Mot. to Compel, [Doc. 59], at 1-4). Epic and the Activision Defendants have moved to compel arbitration on that basis.

## II. Legal Standards

The Federal Arbitration Act ("FAA") "embodies a liberal federal policy favoring arbitration agreements." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) (quotation marks omitted). Section 2 of the Act provides in relevant part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . .

9 U.S.C. § 2. On a motion to compel arbitration, a court undertakes a two-step inquiry to determine (1) whether the parties agreed to arbitrate the dispute in question and, if they did, (2) whether legal constraints external to their agreement foreclose arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628 (1985). Courts apply state contract law to questions regarding the validity, revocability, and enforceability of arbitration agreements. *See Caley*, 428 F.3d at 1368. An arbitration clause may be unenforceable for the same reasons as any other

contract, such as fraud or unconscionability. *See Mitsubishi*, 473 U.S. at 627. Or there may be statutory barriers to arbitration, such as a congressional intention to adjudicate certain substantive rights solely in a judicial forum. *See id.* at 628. When an arbitration agreement clears both prongs of the FAA test, a court must either stay or dismiss the lawsuit and compel arbitration. *See Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008).

### III. Discussion

Antonetti mainly takes issue with the Defendants' contention that an arbitration agreement exists between them. The Eleventh Circuit has made clear that state law governs this issue, *Bazemore v. Jefferson Cap. Sys.*, LLC, 827 F.3d 1325, 1330 (11th Cir. 2016), and the agreements at issue clarify that North Carolina law applies to Epic's EULA and Delaware law applies to the Activision Defendants' EULA and TOU. Under both North Carolina and Delaware law, the burden is on the party asserting the existence of a contract to prove its existence and terms.[4] *Soc'y for Hist. Pres. of Twentysixth N.C. Troops, Inc. v. City of Asheville, et al.*, 282 N.C. App. 700, 707 (2022); *Schwartz v. Chase*, 2010 WL 2601608, at *4 (Del. Ch. June 29, 2010). Because the Court must determine whether an agreement to arbitrate exists between the parties before it can determine whether arbitration must be compelled here, the Court begins its analysis with this issue.

---

[4] Curiously, Epic cites to both Georgia and North Carolina law while the Activision Defendants cite only Georgia law. As the agreements at issue are clear about the applicable choice of law, the Court will abide by the parties' agreements.

## A. Whether Agreements to Arbitrate Exist

The Defendants argue that a valid agreement to arbitrate exists between the parties for a few reasons: (1) Antonetti was required to affirmatively agree to the EULA before playing Fortnite or Call of Duty; (2) both EULAs conspicuously explained that they contained a binding arbitration clause; (3) Antonetti reaffirmed his agreement with the EULAs and TOU multiple times since the creation of his gaming accounts with Epic and the Activision Defendants; and (4) both EULAs and the TOU contained an opt-out provision allowing Antonetti to opt out of the arbitration agreement by written notice within 30 days of his initial agreement, and he did not opt out. (Epic's Mot. to Compel, at 9-12); (Activision Defs.' Mot. to Compel, at 15-18). Epic has identified two accounts it believes Antonetti used to play Fortnite, while the Activision Defendants unsuccessfully sought Antonetti's Call of Duty account information from Antonetti. (Epic's Mot. to Compel, at 5-6); (Activision Defs.' Mot. to Compel, at 6 n.5).

Epic asserts that the March 2019 EULA was the first iteration of its EULA that Antonetti agreed to which contained an arbitration notice, an arbitration clause, a delegation clause, and an opt-out clause. The notice provides, as relevant:

> THIS AGREEMENT CONTAINS A BINDING, INDIVIDUAL ARBITRATION AND CLASS-ACTION WAIVER PROVISION. IF YOU ACCEPT THIS AGREEMENT, YOU AND EPIC AGREE TO RESOLVE DISPUTES IN BINDING, INDIVIDUAL ARBITRATION AND GIVE UP THE RIGHT TO GO TO COURT INDIVIDUALLY OR AS PART OF A CLASS ACTION . . . YOU HAVE A TIME-LIMITED RIGHT TO OPT OUT OF THIS WAIVER.

(Epic's Mot. to Compel, Ex. 4 [Doc. 46-4], ¶ 3 ("Epic EULA")). The arbitration notice appears in all caps and bold font. (*Id.*). The arbitration clause and delegation clause state:

> You and Epic agree to submit all Disputes between You and Epic to individual binding arbitration. "Dispute" means any dispute, claim, or controversy (except those specifically exempted below) between You and Epic that relates to your use or attempted use of Epic's products or services and Epic's products and services generally, including without limitation the validity, enforceability, or scope of this Binding Individual Arbitration section. You and Epic agree to arbitrate all Disputes regardless of whether the Dispute is based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory.
> . . .
>
> You and Epic agree that whether a dispute is subject to arbitration under this Agreement will be determined by the arbitrator rather than a court.

(*Id.* ¶ 12.3.1). The opt-out clause allows an individual to opt out of the arbitration provision by sending written notice to Epic's legal department within 30 days of the date the agreement was first accepted. (*Id.* ¶ 12.6).

The Activision Defendants assert that Call of Duty has contained mandatory in-game EULAs and TOUs since 2019 and that Antonetti therefore must have agreed to the EULA because he was able to play the game. (Activision Defs.' Mot. to Compel, at 5-6). Both the Activision EULA and TOU contain a nearly identical notice in all caps and bold lettering that states: "IMPORTANT NOTICE: THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION AND A WAIVER OF CLASS ACTION RIGHTS." (*Id.*, Ex. C [Doc. 59-9], at 1 ("Activision Defs.' TOU")); (*Id.*, Ex. D [Doc.

59-10], at 2 ("Activision Defs.' EULA")). Both the TOU and EULA's arbitration clauses state:

> READ THIS SECTION CAREFULLY. IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING WAIVING YOUR RIGHT TO FILE A LAWSUIT IN COURT OR TO PURSUE CLAIMS IN A CLASS OR REPRESENTATIVE CAPACITY.
>
> . . .
>
> To the fullest extent allowed by applicable law, you and Activision agree to submit all Disputes between us to individual, binding arbitration pursuant to the provisions in this Section 4. A "Dispute" means any dispute, claim, or controversy (except those specifically exempted below) between you and Activision that in any way relates to or arises from any aspect of our relationship, including, without limitation, your use or attempted use of the Product, all marketing related to the Product, all Services, Service Provided Content, and Virtual Currency, any licensed content, and all matters relating to or arising from this Agreement (including Activision's Privacy Policy and all other terms incorporated into this Agreement) or any other agreement between you and Activision, including any disputes over the validity or enforceability of this agreement to arbitrate. A Dispute shall be subject to these BINDING ARBITRATION AND CLASS ACTION WAIVER provisions regardless of whether it is based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory. This includes claims or requests for relief that accrued before you entered into this Agreement.

(Activision Defs.' TOU ¶ 4); (Activision Defs.' EULA ¶ 16). The delegation provision provides:

> The arbitrator shall determine the scope and enforceability of this arbitration agreement, including whether a Dispute is subject to arbitration. The arbitrator has authority to decide all issues of validity, enforceability or arbitrability, including, but not limited to, where a party raises as a defense to arbitration that the claims in question are exempted from the arbitration requirement or that any portion of this agreement is not enforceable.

(*Id.*). Both agreements also contained an opt-out provision, which provides:

> You have the right to opt-out and not be bound by the arbitration agreement and class action waiver provisions in this [subsection] by sending written notice of your decision to opt-out . . . . The notice must be sent within 30 days of purchasing the Product (or if no purchase was made, then within 30 days of the date on which you first access or use the Product and agree to these terms); otherwise you shall be bound to arbitrate disputes in accordance with the terms of this [subsection].

(*Id.*).

Antonetti does not dispute that, assuming he accepted the TOU and EULAs, he never opted out of the arbitration provision. Instead, he argues that there is no enforceable agreement between the parties because: (1) the Defendants have not presented any evidence that their TOU or EULAs were actually presented to him or ever agreed to by him; (2) they have not correctly identified his gaming user account information; (3) even if he was presented with the TOU and EULAs, he was a minor in 2019 unable to assent to a contract; (4) if he was presented the TOU and EULAs after turning 18 years old, he lacked the capacity to contract due to the severity of his video game addiction; and (5) he disaffirmed the TOU and EULAs by filing this action. (Pl.'s Resp. in Opp. to Epic's Mot. to Compel, at 10-18); (Pl.'s Resp. in Opp. to Activision Defs.' Mot. to Compel, at 6-17).

As an initial matter, the Court need not address the Activision Defendants' arguments about whether the EULA and TOU are enforceable by the Activision Defendants other than Activision Publishing, Inc.—the signatory to the EULA and TOU—because Antonetti has conceded this point by failing to respond to the

Activision Defendants' argument. *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014). As explained previously, state law governs the issue of whether there are binding agreements to arbitrate between the parties. Under Delaware law, "[a] valid contract requires an offer, acceptance, and consideration, and the parties must have intended that the contract would bind them. Additionally, a contract must contain all material terms in order to be enforceable, and those terms must be sufficiently definite." *Shilling v. Shilling*, 2024 WL 4960326, at *5 (Del. 2024) (quotation marks and citations omitted). Similarly, in North Carolina, "the elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *Lannan v. Bd. of Governors of Univ. of N.C.*, 285 N.C. App 574, 596 (2022) (quotation marks, citation, and brackets omitted).

### 1. Epic's EULA

In support of its position that Antonetti agreed to the EULA and thereby formed a valid arbitration agreement, Epic provided a declaration of its product management director, David Saunders. (Epic's Mot. to Compel, Ex. 2 [Doc. 47], ("Saunders Decl.")). Saunders explains that, after downloading the Fortnite game, the EULA is displayed on-screen. (*Id.* ¶ 5). A player may scroll through the EULA before deciding whether to accept or reject its terms but must accept the EULA to be able to play the game. (*Id.*). A player must click "accept" or "decline" using a physical button on either his keyboard or controller. (*Id.* ¶ 6). The arbitration and delegation clauses, as copied above, are displayed prominently at the top of the EULA. (*Id.*

¶¶ 9-12). A player is unable to access or play the game without first accepting the EULA and, whenever EPIC updates the terms of the EULA, players are prompted with the updated EULA after logging in and must affirmatively accept the EULA to continue playing. (*Id.* ¶¶ 13-14). Saunders also identified two Fortnite accounts potentially associated with Antonetti based on his personal information, including email address and IP address: one created in December 2017 and another created in December 2023. (*Id.* ¶¶ 17-18). Based on his records, the user of these accounts agreed to the EULA a cumulative total of at least four times. (*Id.* ¶¶ 20-25).

### 2. Activision Defendants' EULA and TOU

The Activision Defendants provided the declaration of Geoffrey Bent, a senior producer in the Production Management Group at Activision Publishing, Inc., in support of their arguments. (Activision Defs.' Mot. to Compel, Ex. 6 [Doc. 59-6], ¶ 1 ("Bent Decl.")). Bent explains that his responsibilities include working with the design studios and legal departments "to ensure that our [EULAs and TOU] are implemented in-game as part of the player's initial flow into game-play" and that, based on his role, he is personally familiar with the EULA and TOU at issue in this lawsuit. (*Id.*). He further avers that, in order to play a Call of Duty game, a player must first agree to the EULA and TOU, which both also state that the player agrees to the terms therein by continuing on to play the game. (*Id.* ¶¶ 3-4, 8). Before the agreements are presented, a player must create an Activision account using an email address and password and must scroll through the EULA and TOU before he is able

10

to click "accept." (*Id.* ¶¶ 6-7). All Call of Duty Games have included an in-game EULA and TOU since 2019, and even after initially agreeing to an EULA and TOU, a player must agree to any updated EULA and TOU terms before they can continue playing the game. (*Id.* ¶¶ 9-11). If a player does not accept the EULA and TOU, they are unable to create an account or proceed to play the game. (*Id.* ¶ 12).

### 3. Analysis

In general, the Eleventh Circuit has held these types of agreements—known as "clickwrap" or "scrollwrap" agreements—can be enforceable, assuming the applicable elements for a valid contract are otherwise met. *See, e.g., Mason v. Midland Funding LLC*, 815 F. App'x 320, 322 (11th Cir. 2020) (noting that courts have "largely approved the use of clickwrap agreements" because they put consumers "on notice that an agreement exists and [give them] the opportunity to review the terms of that agreement and to consent"). Antonetti's first two challenges to the Defendants' EULAs and TOU—that the Defendants have not presented any evidence that the EULAs and TOU were actually presented to and agreed to by him and have failed to correctly identify his gaming account information—lack merit. Antonetti does not dispute the Defendants' contentions that neither the Fortnite nor Call of Duty game can be played without first agreeing to the EULAs and TOU or that he has played Fortnite since at least December 2017 and Call of Duty since 2016, well before the in-game EULAs and TOU appeared in 2019. (*See* Pl.'s Resp. in Opp. to Epic's Mot. to Compel, at 4); (Pl.'s Resp. in Opp. to Activision Defendants' Mot. to

Compel, at 12 (stating that he began playing Call of Duty at age 11); (Compl. ¶ 29 (stating that Antonetti was 19 years old when this action was filed, making him 11 years old in 2019)). Instead, he contends that if he entered into these agreements with the Defendants, he does not recall doing so. (*See id.*). But the Eleventh Circuit applies a "summary judgment-like standard" to the fact issue of whether parties did or did not enter an arbitration agreement. *Bazemore*, 827 F. 3d 1325, at 1333. And in the summary judgment context, once the party seeking summary judgment (here, enforcement of the arbitration agreement) has identified grounds showing the absence of a genuine dispute of material fact, the burden shifts to the nonmovant to present affirmative evidence showing that a genuine dispute exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

Applying these standards, the Court cannot find that Antonetti's conclusory negations of Saunders's and Bent's declarations carry his burden. In fact, Antonetti's gamesmanship in refusing to provide or confirm his gaming account information is apparent. True, as Antonetti points out, discovery has not yet commenced in this action and he was thus not required to respond to Defendants' counsel's request for that information. But his conclusory assertions that the Defendants' motions must fail because it has not presented evidence that he actually agreed to the EULA and TOU, while simultaneously refusing to confirm the account credentials that would have allowed the Defendants to present such evidence, does not create a "genuine" dispute of material fact. *Bazemore*, 827 F.3d at 1333 ("A dispute is not genuine if it

is unsupported by the evidence or is created by evidence that is merely colorable or not significantly probative." (quotation marks and citations omitted)). Nor does his assertion that he does not recall entering into any agreement. *Park v. Merrill Lynch*, 159 N.C. App. 120, 126 (2003) (finding the plaintiff's assertion that he did not recall seeing the agreement at issue was not a valid defense to contract formation "absent fraud or oppression"). The undisputed facts before the Court as to Epic, then, are that Epic presented the March 2019 EULA, which contained the above cited arbitration and delegation provisions, to Antonetti, who necessarily accepted the provisions because he continued playing Fortnite thereafter. (Saunders Decl. ¶¶ 9-14, 20-25). These facts are sufficient for the Court to find that a valid contract was formed under North Carolina law: Epic offered the opportunity to play Fortnite to Antonetti, in exchange for agreeing to its EULA, Antonetti accepted the EULA, and in consideration of his agreement, he was able to continue playing Fortnite. *Lannan*, 285 N.C. App. at 596. Antonetti has not raised any argument that, assuming he physically accepted the EULA, there was no mutual assent to its terms—instead, his challenges relate only to his legal ability to contract. But these challenges go to the voidability of the contract rather than its validity under North Carolina law, and they are more appropriately addressed with regard to the EULA's delegation provision. *See O'Neal ex rel. Small v. O'Neal*, 254 N.C. App. 309, 314 (2017) ("Ordinarily, when a mentally incompetent person executes a contract or deed before their condition has been formally declared, the resulting agreement or transaction is voidable and not

void."); *Creech ex rel. Creech v. Melnik*, 147 N.C. App. 471, 476 (2001) (stating that contracts are "voidable at the election of the infant."); *Bobby Floars Toyota, Inc. v. Smith*, 48 N.C. App. 580, 582-83 (1980) (discussing disaffirmance as a defense to a valid but voidable contract entered into as a minor). In any event, under North Carolina law, mutual assent is "established by an offer by one party and an acceptance by the other," and the undisputed facts here demonstrate such mutual assent. *Creech v. Melnik*, 347 N.C. 520, 527 (1998).

Likewise, the undisputed facts before the Court as to the Activision Defendants are that the Activision Defendants presented the EULA and TOU containing the arbitration and delegation provisions to Antonetti in 2019, who necessarily accepted the provisions because he continued playing Call of Duty thereafter. (Bent Decl. ¶¶ 9-14); (Pl.'s Resp. in Opp. to Activision Defs.' Mot. to Compel at 12-14 & n. 5 (stating that Antonetti began playing Call of Duty at age 11 and continued playing after he turned 18)); (Compl. ¶¶ 29-31 (stating that Antonetti was 19 years old when the lawsuit was filed in May 2024 and that he continues to play the Defendants' video games)). Again, Antonetti's conclusory assertions that he does not recall agreeing to the EULA and TOU and that the Activision Defendants cannot prevail because there is no evidence that he actually agreed to the EULA and TOU are disingenuous and therefore insufficient to create a genuine dispute of material fact. *Bazemore*, 827 F.3d at 1333. First, as in North Carolina, "a failure to read prevents a plaintiff from proceeding with an avoidance [of a contract] claim as a prima facie matter" under

14

Delaware law. *Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 711 (Del. 2019). The undisputed facts permit the Court to find there is no genuine dispute that a valid agreement to arbitrate was entered under Delaware law. The Activision Defendants offered Antonetti the opportunity to play or continue playing Call of Duty in exchange for his agreement to the EULA and TOU, and in consideration for his agreement, he was able to continue playing the game. *Shilling*, 2024 WL 4960326, at *5. Antonetti does not argue that he did not intend to be bound by any agreement he may have accepted, nor could he, given the EULA and TOU's bold, capitalized caution of the binding nature of the arbitration agreement contained within. (Activision Defs.' TOU, at 1); (Activision Defs.' EULA, at 2). Antonetti also does not argue that the EULA or TOU lacked material or definite terms. Instead, as with his challenges to Epic's EULA, his challenges to Activision's EULA and TOU relate only to his legal ability to contract. As was the case under North Carolina law, these challenges go to the voidability of a contract rather than its validity under Delaware law, too. *See Kuehn v. Cotter*, 77 A.3d 272, 272 (Del. 2013) (contract made by a minor "was voidable, not void."); *Bettis v. Premier Pool & Prop. Mgmt., LLC*, 2012 WL 4662225, at *2 (Del. Ch. Sept. 26, 2012) (noting that if incapacity is established, "the contract may be declared voidable"); *King v. Cordrey*, 177 A. 303, 306 (Del. Super. Ct. 1935) (discussing disaffirmance as a defense to avoid a contract entered into by a minor).

Antonetti replies on *Bazemore* as support for his position that he cannot be compelled to arbitrate because the Defendants have not presented evidence that he

actually agreed to the EULAs and TOU, but the facts are distinguishable. In *Bazemore*, the Eleventh Circuit refused to enforce an arbitration agreement in a credit cardholder agreement that was allegedly mailed to the plaintiff after she opened a credit card with the defendant, in part because the defendant had not provided any "competent evidence" that a copy of the agreement was ever sent to the plaintiff or that the terms it sought to enforce were contained "in the form of any agreement" that would have been sent to the plaintiff. *Bazemore*, 827 F.3d at 1333-34. Here, as to Epic, there is competent, unrebutted evidence that the form of the EULA containing the arbitration and delegation provisions was first presented to Antonetti in March 2019 and that he necessarily assented to it because he continued playing Fortnite thereafter. Epic presented this evidence in the form of Saunders's declaration and copies of the exact version of the agreement that it seeks to enforce. Similarly, as to the Activision Defendants, there is competent, unrebutted evidence that the version of the EULA and TOU containing the arbitration and delegation provisions at issue were presented to Antonetti in 2019, when they first appeared in-game, and that he necessarily assented to them by continuing to play Call of Duty thereafter. The Activision Defendants provided exact copies of the agreements at issue along with Bent's declaration supporting the presentation of the agreements to Call of Duty players.

For all of these reasons, the Court finds that Epic and the Activision Defendants have carried their burdens of demonstrating valid agreements to

arbitrate under North Carolina law and Delaware law, respectively. The parties do not dispute that Antonetti's claims fall within the ambit of the arbitration clause in the respective EULAs and TOU; therefore, the Court must compel arbitration pursuant to the terms of the EULAs and TOU so long as no legal constraints external to the agreements foreclose arbitration. *Mitsubishi Motors Corp.*, 473 U.S. at 628 (1985). As these agreements contain delegation clauses, the Court must assess whether the parties delegated determination of those challenges to the arbitrator. The Court turns to that analysis next.

### B. Whether the Delegation Clauses are Enforceable

Both the Epic EULA and the Activision Defendants' EULA and TOU contain delegation clauses. The Eleventh Circuit has described these clauses as "[a]n agreement to arbitrate threshold arbitrability issues . . . because [they] delegate[] the resolution of disputes about the arbitrability of the parties' claims to an arbitrator." *Attix v. Carrington Mortg. Servs.*, LLC, 35 F.4th 1284, 1295 (11th Cir. 2022). "A delegation agreement is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* (quotation marks and citation omitted). Thus, courts must analyze a delegation clause as another arbitration agreement. If the court finds that the parties have "clearly and unmistakably agreed" to delegate threshold arbitrability issues to an arbitrator, it must enforce the clause unless the court finds merit to a specific challenge to the

"validity or enforceability of the parties' precise agreement to arbitrate threshold arbitrability issues." *Id.* at 1296, 1302. "But if the court finds that the challenge to the validity or enforceability of the delegation agreement lacks merit—or if no such challenge is made—the court must enforce the delegation agreement and send any challenges to the validity or enforceability of the primary arbitration agreement to the arbitrator." *Id.* at 1304.

### 1. The Delegation Clause in Epic's EULA

The delegation clause in Epic's EULA states that Antonetti and Epic agreed to arbitrate all "Disputes," with "Dispute" defined as "any dispute, claim, or controversy . . . between [Antonetti] and Epic that relates to [his] use or attempted use of Epic's products or services and Epic's products and services generally, including without limitation the validity, enforceability, or scope of this Binding Individual Arbitration section." (Epic EULA ¶ 12.3.1). Further, they agreed that "whether a dispute is subject to arbitration under this Agreement will be determined by the arbitrator rather than a court." (*Id.*). The Court finds this clause to satisfy *Attix*'s "clear and unmistakable" language requirement as the parties plainly agreed to delegate issues concerning the validity and enforceability of the arbitration provisions to the arbitrator, as well as questions of whether a dispute is subject to arbitration in the first place.

Antonetti directs several challenges at the delegation clause: (1) he disaffirmed both the delegation and arbitration provisions by filing this lawsuit; (2) he lacked the

capacity to agree to either provision due to his age and video gaming addiction; and (3) the delegation and arbitration provisions are unconscionable. (Pl.'s Resp. in Opp. to Epic's Mot. to Compel, at 17-24). None of these specifically challenge the delegation provision's validity or enforceability apart from the contract's validity or enforceability as a whole. "A party specifically challenges the validity or enforceability of a delegation agreement if, and only if, the substantive nature of the party's challenge meaningfully goes to the parties' precise agreement to delegate threshold arbitrability issues." *Attix*, 35 F.4th at 1304. In other words, the challenge to the delegation provision must "differ from a challenge only to the validity or enforceability of [the] primary arbitration agreement." *Id.* Antonetti's disaffirmance and capacity challenges seek to void the entire EULA and not just the delegation provision. His unconscionability challenge, though more nuanced, also lacks the required specificity. He argues that both the arbitration and delegation provisions are unconscionable because: (1) he was a minor when any agreement was allegedly made and he lacked capacity due to the severity of his addiction; (2) the parties thus lacked equal bargaining power, resulting in a contract of adhesion; (3) and Epic failed to warn him of the addictive nature of its products and, if it had, he would not have agreed to the arbitration and delegation provisions. (Pl.'s Resp. in Opp. to Epic's Mot. to Compel, at 19-24). But success on any of these challenges would result in the invalidation of the EULA as a whole, and not just the delegation provision. In other words, Antonetti does not argue that the threshold arbitration of his defenses would

be unconscionable as a result of these factors; instead, he argues that the EULA as a whole, including the arbitration and delegation provisions, is unconscionable. *See Attix*, 35 F.4th at 1305. For that reason, his challenge to the delegation provision lacks merit, and the Court must send his challenges to the validity or enforceability of the EULA and the arbitration provision—including his infancy, capacity, disaffirmance, and unconscionability arguments—to the arbitrator. *Id.* at 1303.

## 2. The Delegation Clause in the Activision Defendants' EULA and TOU

The delegation clause in the Activision Defendants' EULA and TOU is subject to a similar fate. Antonetti and the Activision Defendants agreed that the arbitrator would determine "the scope and enforceability of this arbitration agreement, including whether a Dispute is subject to arbitration" and would have the authority "to decide all issues of validity, enforceability or arbitrability, including, but not limited to, where a party raises as a defense to arbitration that the claims in question are exempted from the arbitration requirement or that any portion of this agreement is not enforceable." (Activision Defs.' TOU ¶ 4); (Activision Defs.' EULA ¶ 16). Again, Antonetti attacks the delegation provision on grounds that both that provision and the arbitration agreement as a whole are unconscionable, for the same reasons he asserted against Epic. (Pl.'s Resp. in Opp. to Activision Defs.' Mot. to Compel, at 17-23). And for the same reasons this challenge failed as to Epic's delegation clause, it fails here, too. Antonetti has not argued that the threshold arbitration of his defenses to the Activision Defendants' EULA and TOU would be unconscionable and

20

instead argues only that the EULA as a whole, including its arbitration provision, is unconscionable. *Attix*, 35 F.4th at 1305. Therefore, the Court is similarly obligated to send his challenges to the validity or enforceability of the EULA and the arbitration provision—including his infancy, capacity, disaffirmance, and unconscionability arguments—to the arbitrator. *Id.* at 1303.

### C. Whether Arbitration Should Be Compelled

Having found that Antonetti agreed to arbitrate all of the claims he asserts in this action against Epic and the Activision Defendants and that no legal constraints foreclose arbitration, the Court will compel Antonetti to submit his claims to arbitration. And because the Court compels arbitration of all of Antonetti's claims, Epic's Motion to Dismiss will be denied without prejudice to refiling should the arbitrator return this action to the Court.

### IV. Conclusion

For the foregoing reasons, the Defendant Epic Games, Inc.'s Motion to Compel Arbitration [Doc. 46] is GRANTED. The Defendant Activision Blizzard, Inc., Infinity Ward, Inc., and Treyarch Corporation's Motion to Compel Arbitration [Doc. 59], joined by Activision Publishing, Inc. and Sledgehammer Games, Inc., is also GRANTED. Defendant Epic Games, Inc.'s Motion to Dismiss [Doc. 104] is thus DENIED without prejudice. This action is hereby STAYED until further order of the Court.

SO ORDERED, this __31st__ day of January, 2025.

21

THOMAS W. THRASH, JR.
United States District Judge

22